2008 WY 112

**Marcella TESTERMAN, Appellant (Defendant),**

v.

**Gabriel Lee TESTERMAN, Appellee (Plaintiff).**

No. S–08–0006.

Supreme Court of Wyoming.

Sept. 25, 2008.

Representing Appellant: Mary Elizabeth Galvan, Mary Elizabeth Galvan, PC, Laramie, Wyoming.

Representing Appellee: Raymond D. Macchia, Macchia & Associates, LLC, Cheyenne, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1]   This appeal arises from the divorce proceedings of Marcella Testerman and Gabriel Testerman.  The district court awarded primary custody of their ten-month-old daughter to Ms. Testerman, then granted visitation to Mr. Testerman with the aim of having each parent spend approximately equal time with the child.  The district court's express purpose in granting this visitation was to prevent Ms. Testerman from moving to California, as she intended to do, so that the child would stay in Cheyenne and develop a relationship with her father.  Ms. Testerman has appealed the district court's decision.  We will affirm the grant of primary custody to Ms. Testerman, but reverse the district court's decision regarding Mr. Testerman's visitation.

## ISSUES

[¶ 2]   Ms. Testerman lists five issues for our consideration:

1.   Did the district court abuse its discretion when, having found that it was in the child's best interests for her mother to have primary residential custody, it disregarded that finding to implement a parenting time arrangement which is the functional equivalent of joint residential custody?

2.   Did the district court abuse its discretion by implementing a parenting plan which conditioned Ms. Testerman's custodial status on her continued residence in Laramie County?

3.   Did the district court abuse its discretion in ordering an automatic, anticipatory alternating joint residential custody modification when the child enters the first grade in the absence of evidence or findings that prospectively modifying Ms. Testerman's primary residential custody to joint custody is in the child's best interests?

4.   Did the district court abuse its discretion by ordering an automatic future custody modification, without requiring a change of circumstances which affects the child's best interests in her current living arrangement, and without notice and opportunity to be heard?

5.   Did the district court abuse its discretion by reaching beyond the record to devise a parenting plan based on an unidentified "Arizona Parenting Plan" in the absence of supporting evidence that such plan was in the best interests of the minor child and without prior notice and opportunity to challenge the applicability of the plan to the custody issues in this case?

## FACTS

[¶ 3]   The Testermans met in Seoul, South Korea, where both were serving in the military.  They married on June 18, 2004.  They were later transferred to Fort Knox, Kentucky, and served there until both were hon-

orably discharged. They moved to Cheyenne, Wyoming, where their daughter was born on March 25, 2006. Mr. Testerman was employed by the Wyoming Highway Patrol, and Ms. Testerman worked at home as the child's primary caretaker.

[¶ 4] After the move to Cheyenne, their relationship deteriorated. Ms. Testerman describes their married life as "contentious and bitter, characterized by mutual lack of respect and trust, an inability to communicate, and an almost total inability to agree on any issue involving their child." After a while, Ms. Testerman and her daughter came to occupy only the upstairs of their home, with Mr. Testerman living in the basement. Their interactions were infrequent and acrimonious. While each assigns blame to the other, both agree that Mr. Testerman had little to do with caring for his daughter. When the daughter was approximately six months old, Mr. Testerman commenced divorce proceedings.

[¶ 5] Mr. Testerman sought joint custody of his daughter, which he described as "[e]qual time with the mother and the father." Ms. Testerman sought primary custody of her daughter, and indicated that she intended to relocate to California after the divorce. She had grown up there, and her family, including her mother and two sisters, were willing to help provide care for her child. Ms. Testerman had contacted a former employer in California, and understood that she would be rehired upon her return. She had arranged to stay with her sister until she found her own place to live.

[¶ 6] In oral comments following the trial, the district court expressed disapproval of Ms. Testerman's moving to California because, "[i]n reality that is going to terminate Mr. Testerman's relationship with his daughter." The district court signaled its intent to establish a child custody and visitation arrangement that would effectively require Ms. Testerman to remain in Cheyenne, "a place where you don't want to be." The district court provided this explanation:

> The two of you decided to have a baby. With a baby you assume responsibilities. In the assumption of those responsibilities, you gave up options in your lives. You gave up freedom in your lives. In return for the joy you get from her, you give up different things. One of the things you give up is in my mind living apart from each other.... I believe that if [Ms. Testerman and her daughter] live in California that will effectively deprive [the daughter] of the good things that Mr. Testerman can do. I believe that that is not in her best interest.

The district court stated that it would award joint custody of the daughter, and directed the parties to attempt to agree upon a plan that would, at first, allow "brief, frequent opportunities for Mr. Testerman to be with" the child, and then "gradually increase" the "amount of time Mr. Testerman spends with his daughter" so that "within a year" each parent would spend "fairly equal" time with the child.

[¶ 7] The parties were unable to agree, so the district court imposed what it called a "Parenting Plan." In the written divorce decree, it provided that the parents would have joint legal custody, a ruling that neither party disputes. The district court also ruled that it was "in the child's best interests for [Ms. Testerman] to have primary residential custody of the child." Then, with regard to Mr. Testerman's visitation, the district court ruled as follows:

> c. Beginning Monday, February 12, 2007, [Mr. Testerman] shall have parenting time with the minor child from 5:00 p.m. through 8:00 p.m. on Mondays, Wednesdays, Fridays and Saturdays. In addition, on one of the days when he is off work, he will have parenting time between noon and 8:00 p.m. one day per week.
>
> d. When the minor child reaches the age of three, the parenting time referred to in section c immediately above will be increased so that the time between noon and 8:00 p.m. one day per week will be changed to an overnight visit from 5:00 p.m. one day to 6:00 p.m. the next day on a weekly basis. This time will be on one of his days off which the court understands rotate periodically. This schedule will continue until the minor child begins the first grade.
>
> e. When the minor child begins the first grade the parents will share the minor

child every four days, including overnights, so for example, [Mr. Testerman] would have the minor child from 5:00 p.m. on a Monday evening and keep her until he takes her to school Friday morning. [Ms. Testerman] would have the minor child from after school on Friday until Tuesday morning when school starts, and then [Mr. Testerman] would have the minor child after school Tuesday until Saturday morning at 9:00 a.m. and so forth until the minor child reaches the age of 9 at which time the parents will simply alternate the child on a week-to-week basis.

f. When the minor child reaches the age of 3, [Mr. Testerman] may have one two week period of extended visitation each year and shall provide 30 days notice to [Ms. Testerman].

g. [Ms. Testerman] shall be allowed two one week visits or one two week visit, the length of the visit to be at her choice each year so that she may visit her family in California or any other location. She will provide [Mr. Testerman] with 30 days notice of such plans.

To further discourage Ms. Testerman from moving to California, the district court included this provision in the divorce decree:

l. If either parent desires to move from Laramie County he or she shall give the remaining parent 60 days notice. The notice to leave Laramie County may be considered by the Court as a change of circumstances sufficient to give the Court jurisdiction to consider a custody modification.

Ms. Testerman has appealed the district court's rulings.

### STANDARD OF REVIEW

[¶ 8] Child custody decisions are within the sound discretion of the trial court. *Eickbush v. Eickbush,* 2007 WY 179, ¶ 9, 171 P.3d 509, 511 (Wyo.2007).

It has been our consistent principle that in custody matters, the welfare and needs of the children are to be given paramount consideration. The determination of the best interests of the child is a question for the trier of fact. We do not overturn the decision of the trial court unless we are persuaded of an abuse of discretion or the presence of a violation of some legal principle.

*Resor v. Resor,* 987 P.2d 146, 148 (Wyo.1999), quoting *Reavis v. Reavis,* 955 P.2d 428, 431 (Wyo.1998).

### DISCUSSION

[¶ 9] In the divorce decree, the district court stated that it was in the best interests of the child for Ms. Testerman to have primary custody. In making that decision, the district court appropriately considered the factors set forth in Wyo. Stat. Ann. § 20-2-201 (LexisNexis 2007), and its determination is well supported by evidence in the record. Ms. Testerman was the child's primary caretaker, and the evidence demonstrated that she was a good mother. Although the parties disagreed as to the underlying reasons, Mr. Testerman had very little responsibility for or experience with caring for his daughter. There was also evidence of what the district court called immature behavior on Mr. Testerman's part. For example, on the night Ms. Testerman and her daughter were released from the hospital, Ms. Testerman was restricted from lifting more than ten pounds, and the baby suffered from jaundice, but Mr. Testerman went out with a friend, leaving the mother and child alone for more than four hours. The district court's comment about this incident was: "Mr. Testerman, you need to grow up. I can't believe that you did that."

[¶ 10] There was also evidence indicating that Mr. Testerman cared very much for his daughter, and wanted to spend more time with her. The district court aptly summarized the evidence by observing that Ms. Testerman had a "terrific ability" to provide care for the child, while "Mr. Testerman, I think, has the intent to do that. I think he has the desire to do that. I think he is still learning how to do it." Given this evidence, and the district court's evaluation of it, it was no abuse of discretion to grant primary custody to Ms. Testerman.

[¶ 11] The district court's "Parenting Plan" is more problematic. We first observe that Wyoming statutes require the court,

when granting a divorce, to establish "custody of a child" and "visitation." Wyo. Stat. Ann. §§ 20–2–201, –202. There is no mention of a "parenting plan" or "parenting time," two terms used by the district court. The district court may have revealed its source for those terms when it told the parties that "This parenting schedule is rather novel and I have set this up after reviewing the Arizona parenting plan." Turning to the Arizona statutes, we find that "parenting time" is a term defined as:

> the condition under which a parent has the right to have a child physically placed with the parent and the right and responsibility to make, during that placement, routine daily decisions regarding the child's care consistent with the major decisions made by a person having legal custody.

Ariz.Rev.Stat. Ann. § 25–402 (2008). The Arizona Court of Appeals has explained that "Physical custody involves the child's residential placement, whereas parenting time is what is traditionally thought of as 'visitation.'" *Owen v. Blackhawk,* 206 Ariz. 418, 421, 79 P.3d 667, 670 (Ariz.Ct.App.2003). This indicates that the district court's term "parenting time" was meant to be synonymous with the Wyoming statutory term "visitation."

■ [¶ 12] There is some risk of confusion when a court replaces the words found in our Wyoming statutes with terms borrowed from other jurisdictions. At the same time, other jurisdictions can be a source for innovative approaches to difficult legal problems. Such innovations, however, must remain consistent with Wyoming statutes and precedent.

[¶ 13] The district court said it was awarding primary custody to Ms. Testerman. Wyoming statutes do not define "primary custody," but we have suggested a meaning by saying that "awarding custody to one parent fixes that parent as the primary nurturer of the child and the one with whom the child shall reside." *Gurney v. Gurney,* 899 P.2d 52, 54 (Wyo.1995). This aptly describes the custody arrangement for the Testermans' daughter in the beginning: residing with Ms. Testerman as her primary nurturer, with visitation by Mr. Testerman on four evenings and one afternoon per week.

[¶ 14] Over time, however, Mr. Testerman's visitation increases so that, by the time the child enters school, she will spend four days with each parent in alternation. That custody and visitation arrangement seems inconsistent with the district court's award of primary custody to Ms. Testerman. It is an arrangement more like joint custody. Wyoming statutes do not define "joint custody," but again turning to the Arizona statutes, we find this definition:

> "Joint physical custody" means the condition under which the physical residence of the child is shared by the parents in a manner that assures that the child has substantially equal time and contact with both parents.

Ariz.Rev.Stat. Ann. § 25–402. In language echoing this statutory definition, the district court specifically told the Testermans that its "intent with regards to sharing parenting time is that within a year that it will *be fairly equal.*" (Emphasis added.) The plan imposed by the district court might also be described as "divided" or "alternating" custody, in which custody is divided between the parents on an alternating basis. *See* DaNece Day Koenigs & Kimberly A. Harris, Comment, *Child Custody Arrangements: Say What You Mean, Mean What You Say,* 31 Land & Water L.Rev. 591, 601 (1996).

■ [¶ 15] But "[w]hether termed 'divided,' 'shared,' or 'joint physical custody,'" such arrangements are not favored. *Reavis,* 955 P.2d at 432. "We have repeatedly said that divided or shared custody is not favored by this Court absent good reason therefore." *Eickbush,* ¶ 11, 171 P.3d at 512. We have explained that "stability in a child's environment is of utmost importance to the child's well-being," *Reavis,* 955 P.2d at 432, while "a measure of instability is inherent" in joint custody arrangements. *Gurney,* 899 P.2d at 55. We have emphasized that the "success of a joint or shared custody arrangement hinges on the extent to which the parents are able to communicate and agree on the matters relevant to the children's welfare." *Reavis,* 955 P.2d at 433.

[¶ 16] The evidence of record casts serious doubt on the Testermans' ability to communicate and agree on matters regarding their child. In fact, it seems that they rarely agreed on any aspect of raising their daughter. They disagreed about whether and when Ms. Testerman should return to work. They disagreed about feeding schedules, and about how long Ms. Testerman should breast feed the child. They disagreed about the amount of time Mr. Testerman spent with his friends and away from his family, and about the amount of contact the daughter should have with his friends. They disagreed about how to use money Ms. Testerman had set aside for their daughter's education. Mr. Testerman wanted to use it to buy recreational vehicles for himself and his friends. Given the inability of the Testermans to communicate and agree on matters relevant to their daughter's welfare, it seems unlikely that the "parenting plan" imposed by the district court could prove workable or contribute any stability to the child's environment.

[¶ 17] The district court articulated only one reason for imposing the visitation it did: to allow Mr. Testerman and the child to develop and maintain a relationship. That was a laudable goal, but it falls well short of the "good reasons" needed to justify the *de facto* joint custody imposed by the district court. Absent good reasons, explained in the record, the district court abused its discretion in ordering this custody and visitation arrangement.

[¶ 18] Further, the custody and visitation arrangement established by the district court impinged on Ms. Testerman's rights to travel and relocate. As we have observed, "It is unrealistic to assume that divorced parents will remain in the same location after dissolution of the marriage *or to exert pressure on them to do so.*" *Resor,* 987 P.2d at 151 (emphasis added). The "parenting plan" imposed by the district court did exert pressure on Ms. Testerman to remain in the same location. It was meant to do so. This was an improper restraint on Ms. Testerman's protected constitutional rights:

> The right of travel enjoyed by a citizen carries with it the right of a custodial parent to have the children move with that parent. This right is not to be denied, impaired, or disparaged unless clear evidence before the court demonstrates another substantial and material change of circumstance and establishes the detrimental effect of the move upon the children.

*Watt v. Watt,* 971 P.2d 608, 615–16 (Wyo. 1999).

[¶ 19] The district court also provided in the divorce decree that if either parent gave notice of an intent to move from Laramie County, that "may be considered by the Court as a change of circumstances sufficient to give the Court jurisdiction to consider a custody modification." However, "our precedent is quite clear that relocation, by itself, cannot be a substantial and material change in circumstances sufficient to justify reopening a custody order." *Harshberger v. Harshberger,* 2005 WY 99, ¶ 12, 117 P.3d 1244, 1250 (Wyo.2005); *Gurney,* 899 P.2d at 55; *Love v. Love,* 851 P.2d 1283, 1288–89 (Wyo.1993).

> *Love* and *Gurney* together capture a rule that a relocation by a custodial parent, where the motivation for the relocation is legitimate, sincere, in good faith, and still permits reasonable visitation by the noncustodial parent, is not a substantial and material change in circumstances. A trial court abuses its discretion in making a contrary ruling that such a move amounts to a substantial and material change in circumstances.

*Watt,* 971 P.2d at 614. The district court violated established legal principles when it ruled that Ms. Testerman's relocation could amount to a material change of circumstances justifying a change of custody.

[¶ 20] We recognize that child custody and visitation decisions are among "the most difficult and demanding tasks assigned to a trial judge." *Reavis,* 955 P.2d at 431. We also have no doubt that the district court attempted to craft a custody and visitation arrangement in this case that was in the best interests of the child. However, the district court imposed *de facto* joint custody without establishing the good reasons needed to support this arrangement. The sole reason giv-

en for this arrangement was to keep Ms. Testerman in Cheyenne, which violates her constitutional rights. Based upon our precedent, we are forced to conclude that the district court abused its discretion and violated legal principles in establishing this custody and visitation arrangement.

[¶ 21] We therefore affirm the district court's decision to grant primary custody to Ms. Testerman. We reverse its decision concerning Mr. Testerman's visitation, specifically paragraphs 13.c. through 13.l. of the Amended Decree of Divorce, and remand to the district court with directions to establish visitation arrangements consistent with this opinion.