196 P.3d 174 (2008)
2008 WY 135
Amy Jean BUTTLE, Appellant (Plaintiff),
v.
Joshua John BUTTLE, Appellee (Defendant).
No. S-08-0090.
Supreme Court of Wyoming.
November 14, 2008.
*175 Representing Appellant: Dameione S. Cameron and Dean R. Winegar of Parsons & Cameron, PC, Cheyenne, Wyoming.
Representing Appellee: Donald A. Cole of Cole & Cole Law Firm, Cheyenne, Wyoming.
Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.
KITE, Justice.
[¶ 1] In divorce proceedings ending the marriage between Amy Jean Buttle (Mother) and Joshua John Buttle (Father), the district court ordered that Mother should have primary physical custody for decision making purposes but then determined the parties should share physical custody of their four-year-old child, meaning each parent would *176 have custody 50 percent of the time. The district court declined to make a finding concerning Mother's allegations of spousal abuse. Mother appeals, claiming the district court abused its discretion in ordering shared custody and not considering her claims of spousal abuse as being contrary to the best interest of the child.
[¶ 2] We find no abuse of discretion in the manner in which the district court addressed the spousal abuse evidence. We reverse the district court's custody order however, because we conclude that it abused its discretion in deciding shared custody was in the child's best interest.

ISSUES
[¶ 3] The issues for this Court's determination are:
1. Whether the district court abused its discretion when it declined to make a finding that spousal abuse occurred and was contrary to the best interest of the child.
2. Whether the district court abused its discretion when it awarded Mother and Father shared physical custody.

FACTS
[¶ 4] The parties married on September 6, 2002. One child, a son, was born two and a half years later. During the marriage, the parties lived on a ranch located near LaGrange, Wyoming, 45 miles northeast of Cheyenne. Father was employed on the ranch, Mother commuted to work in Cheyenne five days per week and the child attended day care in LaGrange while Mother was working.
[¶ 5] Mother filed a complaint for divorce on September 11, 2007. She sought an order giving the parties joint legal custody of the child but awarding primary physical custody to her. At the time, the parties were still living in the home on the ranch property, but Mother had obtained a job in Alabama and planned to move there with the child. In her complaint, Mother sought an order allowing Father liberal visitation, taking into consideration the potential distance between him and the child. She asked the district court to accept a reasonable "parenting plan"[1] that maximized the time Father could spend with his son.
[¶ 6] Father answered the complaint and filed a counterclaim for divorce in which he asked for joint legal custody and primary residential custody, with Mother having liberal "co-parenting"[2] time with the child. Father also filed a motion for temporary custody of the child and a motion to keep the child in Laramie County, asserting the child had lived all but six months of his life on the ranch and it was not in his best interest for Mother to disrupt the stability of his life by moving him out of state away from family and friends.
[¶ 7] Mother responded to Father's motions and filed her own motion for temporary custody. She asserted that she had been the child's primary caretaker since his birth and it was in his best interest to remain with her. Apparently, the district court held a hearing on the motions on September 21, 2007, and ordered that the child remain in Laramie County and the parties share custody until the divorce trial.[3]
[¶ 8] The district court conducted the trial on October 17, 2007. The undisputed evidence *177 showed that Mother had been the child's primary caregiver throughout his life. Both parties testified that Mother got the child up and ready in the morning and took him to day care before driving to work in Cheyenne. She also picked the child up from day care in the evening when she returned to LaGrange. Father was frequently not at home in the evenings. Mother bathed the child and put him to bed at night. Father testified that he worked on the ranch at least part of most weekends during the marriage. Mother frequently took the child to Cheyenne for outings or to Saratoga to see her family on weekends. While Father testified that Mother prevented him from spending time with the child, Father conceded that he chose to rodeo and drink with his friends when he could have been with his family.
[¶ 9] Mother testified that she was no longer planning to move to Alabama because the district court had suggested at a prior hearing that she find a job in Wyoming or Colorado.[4] She testified that she was currently living in Cheyenne but planned to move to Saratoga where she had a job offer, could live in her sister's house and be close to her parents. She testified that she wanted to move to Saratoga because her parents were there, it is a nice community in which to raise a child and, given the violence that occurred in the marriage, she thought some distance between her and Father would be beneficial.
[¶ 10] Mother testified that the parties' marital problems were caused by Father's anger and drinking, which led to physical and verbal confrontations. She testified that she was afraid of Father and had concerns about how he might treat the child during visitation when he was alone with him. Father confirmed that the parties fought but not to the degree Mother claimed. He testified that the physical confrontations were before the child's birth and were less violent than Mother testified. He testified that early on in the marriage the fights involved both parties trying to "be the head of household." One of the verbal fights later on involved Mother's threats to take the child away from him.
[¶ 11] Father testified that in the three weeks between trial and entry of the temporary custody order, he and the child spent time together. He bathed the child, fed him, put him to bed and took him to work with him when he could. He testified that the child loved being at the ranch and that he and the child had "an amazing relationship now." Father asked for "as close to the 50/50 [custody] as I can get."
[¶ 12] After the parties presented their evidence, the district court considered the evidence of spousal abuse along with the other evidence presented and declined to make a finding that abuse occurred or to determine custody based upon such a finding. The district court found that the parties should have shared custody and the child should spend equal time with each of them. The court asked the parties to confer and determine what period of time the child should spend with each of them.
[¶ 13] On November 8, 2007, Mother filed a motion pursuant to W.R.C.P. 59(a) asking the district court to re-open the evidence and amend the judgment (although no written judgment had been entered) concerning visitation. Mother alleged that on October 28, 2007, at 2:30 a.m., while the child was in Father's care but apparently not with him, Father was arrested for driving under the influence and interfering with a police officer. No ruling on the motion appears in the record, although Mother states in her brief that the district court denied the motion.
[¶ 14] In January of 2008, the district court entered a decree of divorce. With regard to custody, the district court found that Mother should be the primary custodial parent for final decision-making authority.[5] The district court further found that it was in *178 the best interest of the child for the parties to have shared custody "with each party receiving fifty percent (50%) physical co-parenting time with the child with each parent having four days on four days off." The district court further found that it was in the best interest of the child that Mother and Father discuss where the child should attend school when he reached school age and if they could not resolve the issue then the court would resolve it. Mother appealed.

STANDARD OF REVIEW
[¶ 15] We review a district court's custody determination according to the following standards:
Child custody decisions are within the sound discretion of the trial court.
It has been our consistent principle that in custody matters, the welfare and needs of the children are to be given paramount consideration. The determination of the best interests of the child is a question for the trier of fact. We do not overturn the decision of the trial court unless we are persuaded of an abuse of discretion or the presence of a violation of some legal principle. Resor v. Resor, 987 P.2d 146, 148 (Wyo.1999), quoting Reavis v. Reavis, 955 P.2d 428, 431 (Wyo.1998).
Testerman v. Testerman, 2008 WY 112, ¶ 8, 193 P.3d 1141, 1144 (Wyo.2008).
A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. Our review entails evaluation of the sufficiency of the evidence to support the district court's decision.... Findings of fact not supported by the evidence, contrary to the evidence, or against the great weight of the evidence cannot be sustained. Similarly, an abuse of discretion is present when a material factor deserving significant weight is ignored.
Eickbush v. Eickbush, 2007 WY 179, ¶ 9, 171 P.3d 509, 511 (Wyo.2007) (citations omitted).

DISCUSSION

1. Evidence of Spousal Abuse
[¶ 16] Wyo. Stat. Ann. § 20-2-201(c) (LexisNexis 2007) provides:
The court shall consider evidence of spousal abuse or child abuse as being contrary to the best interest of the children. If the court finds that family violence has occurred, the court shall make arrangements for visitation that best protects the children and the abused spouse from further harm.
Mother contends the district court failed to comply with this mandatory provision because it declined to consider the evidence that she had been physically abused by Father as being contrary to the best interest of the child. Father maintains that, after considering the parties' testimony, weighing their credibility and concluding the majority of the violence occurred before the child's birth, the district court properly exercised its discretion and determined that neither a finding that domestic violence occurred nor a custody determination based upon such a finding was appropriate.
[¶ 17] In support of her claim that spousal abuse occurred, Mother testified that Father drank three or four times per week and often did not come home until late. She testified that sometimes they fought when he arrived home late. On one occasion, Father threw her down on the ground, held her by the hair and choked her. Another time, she locked herself in the bedroom when they were fighting and he kicked the door open. She tried to leave and he followed her, shoving her repeatedly and finally threw her to the ground and kicked her. She testified that he called her derogatory names and on several occasions kicked or hit the furniture and walls. She testified that on one occasion, after the child was born, Father said he "should beat the ____ out of [her]," maybe that would get a reaction, and when she did not respond, he hit the wall next to her head.
[¶ 18] Father confirmed that the parties fought and that their fights "got rough at times." He denied ever choking or kicking Mother, but admitted that he held her down one time during a fight and pushed her down another time. He testified that Mother was physical with him, too; one time she pushed him, on another occasion she threw a phone *179 at him and another time she knocked the front storm door down. Father testified that no physical fights occurred after the child's birth but that verbal fights continued. Father admitted that he called Mother names, such as "fat cow" or "pig" and that he had done so within ear shot of the child. Father also confirmed that he drank regularly, consuming an average of six or seven beers after work, and that he "probably" did not remember things clearly when he was drunk.
[¶ 19] In addressing the parties' testimony concerning the claim of spousal abuse, the district court made the following statements from the bench:
I'm aware of the impact that Mr. Buttle's behavior had on you and your belief that it was in your best interest from the standpoint of your mental status to get away and to leave. Mr. Buttle to his credit admitted some of the horrible things that you say he did. There's no excuse for that.... [T]he majority of the violent things apparently took place before [the child] was born. That means in my mind... that it would be inappropriate for me to make a finding that domestic violence occurred and that I'm making a decision of noncustody based upon that finding.
There are no manuals, there are no guide books you can go to and say, okay, this marriage isn't going to work. What do we do? Sometimes people know of no other way than to react either by silence or removal or by violence and striking out.
As I say, Mr. Buttle, there is no excuse for doing the things that you did. But I believe you when you say that conduct won't impact your ability to be a good parent. Obviously, there are irreconcilable differences that were present.
And I want to tell both of you also that I have been doing this kind of work for way too long, over 30 years. I can tell you that it is very, very rare for a marriage to breakdown because of the conduct of one of the parties.... [M]y point in saying that is I don't want the Decree to say that one person is awarded the divorce.[6]
[¶ 20] Addressing Mother's concerns about Father's behavior when he is with the child alone, the district court stated:
I don't get the feeling ... that the things about which you complain will adversely impact your son's welfare. What I mean by that is that I don't believe that when [the child] is with his father that his father is going to stay out late at the bars. I don't believe he is going to be violent with him. I don't believe he's going to mistreat him or animals in his presence. Certainly those are things you need to work on, Mr. Buttle.
[¶ 21] From these excerpts it is clear the district court considered the evidence of spousal abuse. Mother's contention, therefore, that the court did not consider the evidence is incorrect. If an abuse of discretion occurred on this issue, it involved the district court's statements that it should not make a finding that spousal abuse occurred or base its custody determination on such a finding. In particular, we note that the district court inferred that Father's admissions that he was physically violent with Mother prior to the child's birth were not sufficient evidence upon which to base a custody determination. In that regard, we believe such evidence was appropriate for the district court to have considered and we see nothing in the record, other than Father's promises to behave differently, to insure rehabilitation of Father's inclination to resort to violence when frustrated or threatened.
[¶ 22] However, considering all of the evidence and the district court's statements in their entirety, we hold the district court did not abuse its discretion in declining to base its custody determination on the evidence of abuse. While there is no question from the evidence that the parties fought, their fights involved physical confrontations, and such confrontations were contrary to the best interest of the child, we conclude the district court could have reasonably determined from the totality of the evidence that Mother should have primary legal custody subject to liberal visitation by Father.
*180 [¶ 23] In reaching this result, we do not minimize the seriousness of spousal abuse. We are cognizant of the effects domestic violence and spousal abuse can have on the victim and family. As we have said before, we are particularly aware of the negative effects this sort of violence can have on children. Jackson v. Jackson, 2004 WY 99, ¶ 17, 96 P.3d 21, 27 (Wyo.2004). However, in determining custody in the best interest of a child, evidence of spousal abuse is only one of the factors district courts are required to consider.
[¶ 24] Pursuant to § 20-2-201(a)(i) through (x), the court was required to also consider: the quality of the child's relationship with Mother and Father; the ability of Mother and Father to provide adequate care for the child throughout each period of responsibility; the respective competency and fitness of Mother and Father; each parent's willingness to accept all parental responsibilities; how the parents and child can best maintain and strengthen their relationships with each other; how the parents and child interact and communicate with each other; each parent's ability and willingness to allow the other to provide care and respect the other's rights and responsibilities; geographic distance between residences; each parent's physical and mental ability to care for the child; and other relevant factors.
[¶ 25] While evidence that spousal abuse occurred is contrary to the best interest of the child, such evidence must be considered along with all of the other factors. Here, there is no question that the district court considered the evidence of spousal abuse. It is equally clear, however, that it was not persuaded from the totality of the evidence that the spousal abuse evidence should prevent Father from having liberal visitation. Given the district court's unique opportunity to observe the witnesses and hear their testimony in person, we are not at liberty to second guess its decision absent a finding that it could not reasonably have concluded as it did. Having carefully considered the testimony and the district court's statements, we do not make that finding. Although we might have reached a different conclusion, that is not sufficient grounds for concluding the district court abused its discretion.
[¶ 26] In reaching this result, we are influenced by Jackson, ¶ 17, 96 P.3d at 27, a case in which we considered a similar claim. There, the wife asserted the district court abused its discretion when it failed to consider evidence of spousal abuse, which she alleged her former husband had committed against her, as contrary to the best interests of the children as required by § 20-2-201(c). Wife had testified that when the police were called to address an altercation between her and her husband, he pushed her in the car and she grabbed him by the throat; then he grabbed her by the hair, shook her and pushed her through a fence. Husband testified that he never touched wife unless she physically assaulted him first. Wife also testified that husband head-butted her in the face. However, husband's sister, who witnessed the incident, testified that wife was the aggressor and husband was trying to get away from her. The sister also testified that wife was the aggressor against husband numerous times.
[¶ 27] We said:
While it is clear from the record that the Jacksons' relationship was volatile, we must defer to the district court to determine whether their actions constituted spousal abuse such that it should impact the court's custody evaluation. Again, the trial judge is in the best position to assess the credibility of the witnesses and weigh their testimony. It appears from the record that the district court was not convinced of any clear-cut spousal abuse by Mr. Jackson and found the attacks by both parties did not rise to a level that should impact its decision as to what was in the children's best interests. Accordingly, we hold the district court did not abuse its discretion in the manner in which it considered the conflicting testimony regarding spousal abuse.
Jackson, ¶ 19, 96 P.3d at 27-8 (citation omitted).
[¶ 28] The evidence presented in Jackson may have been different in degree from that presented in this case; however, in both cases, the district court was in the best position *181 to weigh the testimony and assess the witnesses' credibility. In contrast, this Court's review is confined to the written record. In both cases the district court was not convinced the evidence of violence rose to a level that it should impact its decision concerning the child's best interest. Like in Jackson, we cannot say the district court acted in a manner which exceeded the bounds of reason under these circumstances. We conclude, therefore, that no abuse of discretion occurred.

2. Shared Custody
[¶ 29] Mother also claims the district court abused its discretion when it entered a shared custody order giving each parent equal time with the child, specifically four days for Mother and four days for Father. She claims the order is contrary to the statutory requirement that custody be determined based upon the child's best interest. She asserts it is not in the child's best interest to travel 200 miles between Saratoga and LaGrange every four days, spend a significant amount of time each week in the car, attend different day cares and travel in dangerous conditions during the winter months.
[¶ 30] Father contends the district court considered the particular facts and circumstances of this case, including the geographical distance between the parents and their mutual love for the child and fitness as parents, and properly concluded that shared custody was in the child's best interest. Father also maintains that the parties' rural lifestyle accustomed them to driving long distances and shared custody did not require significantly more travel than the child experienced before the divorce. Father asserts that the district court properly found that stability can be achieved by keeping a regular schedule and the child's regular schedule from birth until the divorce consisted of living on the ranch, going to the same day care and spending time regularly with Father's family and friends.
[¶ 31] In Testerman, ¶ 15, 193 P.3d at 1145, this Court reviewed our precedent concerning shared custody.
"We have repeatedly said that divided or shared custody is not favored by this Court absent good reason therefore." Eickbush, ¶ 11, 171 P.3d at 512. We have explained that "stability in a child's environment is of utmost importance to the child's well-being," Reavis, 955 P.2d at 432, while "a measure of instability is inherent" in joint custody arrangements. Gurney, 899 P.2d at 55. We have emphasized that the "success of a joint or shared custody arrangement hinges on the extent to which the parents are able to communicate and agree on the matters relevant to the children's welfare." Reavis, 955 P.2d at 433.
[¶ 32] When a district court's exercise of discretion in custody matters involves splitting custody of children between parents or other unconventional custody approaches, we have said it must provide an explanation of its reasoning and place its findings on the record so that, upon review, this Court can be sure that a comprehensive evaluation of all relevant factors occurred prior to determining custody. Pace v. Pace, 2001 WY 43, ¶ 17, 22 P.3d 861, 867 (Wyo.2001). In the present case, the district court stated its findings in the decree as follows:
6. The court finds that it is within the best interests of the minor child for the parties to have shared custody with each party receiving fifty percent (50%) physical co-parenting time with the child with each parent having four days on four days off. [Mother] shall be deemed the primary custodial parent for final decision-making authority.[7]
7. The court finds that it is in the best interest of the minor child that both the [Mother] and [Father] discuss where the child should attend school when he attains school age. If the parents can not come to a resolution to this matter, this court shall make the final decision on the matter.
*182 Thus, the decree sheds no light on the district court's reasoning for its findings.
[¶ 33] From the record, we discern several considerations that seem to have been important to the district court in making its custody determination. The district court emphasized that it preferred to make its decision based upon the "inherent character" of each parent, rather than on things the parties may have done that they "wouldn't dream of doing" if they had been getting along. The district court accepted Father's testimony that the drinking and violent conduct he had engaged in during the marriage would not impact his ability to be a good parent. The court stated that it did not believe Father would stay out late at the bars when the child was with him or be violent with the child. The court concluded that Father's past behavior would not adversely impact the child's welfare.
[¶ 34] The court concluded that Mother and Father were both good parents and had a desire to insure that the child spend significant time with the other parent. Citing § 20-2-201(a)(iv), which requires consideration of each parent's willingness to accept all parenting responsibilities including a willingness to accept care for the child or relinquish care to the other parent at specified times, the district court found that both parents showed concern for the child's best interest in allowing the other parent time with the child. The district court noted specifically Father's decision on one occasion to shorten his time with the child because the child was having a difficult time and he thought it was in the child's best interest to return to Mother.
[¶ 35] The district court concluded that travel time did not seem to be an obstacle in this case, stating, "Most of us who live out in the rural part of our state accept that as a way of life; we deal with the bad roads, we deal with the inconvenience, we deal with the expense." The court also noted that stability can take different forms; it might be the child attending the same day care five days per week or it might be having a regular schedule. The district court then stated:
It's my finding that it is appropriate for [the child] to spend equal time with both of you. And I'm glad to hear that you're prepared to facilitate that, [Mother]. The length of time is kind of problematic because he is only three and a half. I think he has to have shorter periods of time with... both of you which increases the travel, increases the expense, increases the inconvenience.
The district court asked the parties and their attorneys to confer and determine what the period of time should be. It referred to this shared custody arrangement as a "stopgap measure" that would not work once the child was in school. Apparently the parties were not able to agree to a period of time, and so the district court entered its shared custody order giving Mother and Father each four days with the child until he starts school in the fall of 2009.
[¶ 36] As we have said, our review of the district court's order is limited to deciding whether it abused its discretion in ordering shared custody. In deciding that question, we consider whether the evidence the parties presented and the district court's findings supported the court's conclusion that shared custody was in the child's best interest. Specifically, we decide whether the arrangement the district court imposed will promote stability in the child's environment, which is of the utmost importance to his well-being. Reavis v. Reavis, 955 P.2d 428, 432 (Wyo.1998).
[¶ 37] It is clear from the evidence presented in this case that the shared custody arrangement the district court imposed requires the child to spend at least three hours every fourth day traveling on the highways between Saratoga and LaGrange. In the winter months, those hours will likely be extended by weather conditions making travel slower and more dangerous. The arrangement also requires the child to attend two different day cares during the course of every week throughout the year. Additionally, it requires the four-year-old child to be separated from his primary caretaker every fourth day for a four-day period.
[¶ 38] We see nothing in the record supporting the shared custody arrangement, other than the district court's finding that *183 both parents were "good parents," a finding that would be true in many, if not most, divorces. That fact alone is not sufficient to support a custody arrangement that this Court has noted is not favored and carries the potential for disrupting the child's life. Among the most frequently cited contraindications for joint custody is parents who do not live in close proximity. As one child custody authority has said:
The frequent shifts back and forth in the child's environment with the child having two "primary" homes, requires a great deal of flexibility and cooperation both on the part of the parents and the child. * * * The degree to which a particular arrangement will work may depend not only on cooperation and flexibility, but also on proximity of the parents and the emotional adaptability of the child. When parents live near each other, the child may not have to face the added adjustment of two different peer environments.
Jeff Atkinson, 1 Modern Child Custody Practice § 6-6, 6-9 (2004). Here, the parents do not live in close proximity. Under these circumstances, the district court's finding that they are both "good parents" does not support shared custody.
[¶ 39] Another important factor for our consideration in reviewing the district court's order is the extent to which the parents are able to communicate and work together to promote the child's best interest.
The premise of the joint custody order is the parents' ability to resolve between themselves the custodial details. There can be little question that joint custody requires sincere dedication on the part of each parent to safeguard the security and stability vital to a child's best interest. When the parents are unable to make this cooperative arrangement work, a change of circumstances justifying judicial reexamination of the original joint custody order is demonstrated.
Gurney v. Gurney, 899 P.2d 52, 55 (Wyo. 1995) (citation omitted). Similarly, when the evidence demonstrates the parents have been unable to communicate during the marriage, a joint or shared custody order is not appropriate in the first place.
[¶ 40] It is abundantly clear from this record that Mother and Father have no history of effective communication or cooperative decision making. Regardless of which party's testimony is believed as to who was at fault, it is undisputed that Mother and Father fought throughout the marriage, sometimes violently. Mother testified that she and Father were never really able to communicate. Father testified they had a tough time deciding what they did, where they went, and who was going to be the head of household. They clearly disagreed on the sort of lifestyle they wanted to live, with Father being away from home frequently drinking with friends and Mother at home alone caring for the child. It is undisputed that in addition to physical violence, their disagreements led to name calling and derogatory words, at least on the part of Father. When they made the decision to divorce, they were unable to agree on a custody arrangement or even as to the number of days the child would spend with each of them under the court ordered shared custody. Given the parties' inability to communicate effectively and agree on matters relevant to the child's welfare, it seems unlikely that the shared custody arrangement the district court imposed will ensure a stable environment for the child.
[¶ 41] In addition to these factors weighing against the conclusion that the arrangement is in the child's best interest, the district court left undetermined how custody will work when the child starts school in the fall of 2009. Rather than awarding primary physical custody to one parent and liberal visitation to the other from the date of the decree through the child's school years, the current order requires the parties to agree on a different arrangement once the child starts school or, failing that, return to the district court and let it decide. The fact that the child's future primary residence remains undecided further undermines the stability of his environment.
[¶ 42] While never really articulating its reasoning for imposing the joint custody arrangement, the thrust of the district court's order appears to have been to *184 ensure that both parents have equal time with the child. In Testerman, ¶ 17, 193 P.3d at 1146, where the district court's primary reason for ordering joint custody was to enable father and child to establish and maintain a relationship, we said, "that was a laudable goal, but it falls well short of the `good reasons' needed to justify the de facto joint custody imposed by the district court." The same can be said of the district court's order in this case. A desire to give the child equal time with each parent does not justify a shared custody arrangement which requires a four-year-old child to travel long distances every fourth day between two residences in different counties and attend two day cares. A desire to give the child equal time with each parent does not justify a shared custody arrangement between parties who were unable to communicate effectively or cooperatively resolve disputes during their marriage. Neither does a desire to give the child equal time with each parent justify a shared custody arrangement that is temporary and leaves open the question of where the child will reside when he reaches school age and requires the same parties, who previously were unable to agree, to resolve the issue or return to court in less than a year. Under these circumstances, a desire to give the child equal time with each parent does not outweigh, but in fact undermines, the child's best interest and his need for a stable environment.
[¶ 43] In Resor v. Resor, 987 P.2d 146, 152 (Wyo.1999), we quoted the Washington Supreme Court as follows:
The practical result of a marriage dissolution is that parenting and family life will not be the same after dissolution. This is so even though a trial court may believe it is in the "best interests of the child" to continue to live in the same family unit. A child cannot escape the reality that his or her family is no longer the same. The trial court does not have the responsibility or the authority or the ability to create ideal circumstances for the family. Marriage of Littlefield, 133 Wash.2d 39, 940 P.2d 1362, 1371 (Wash.1997).
When parties have decided to divorce and lead separate lives, "the court's objective is not to reconstruct a family that is no more, but to provide the framework for a new family that can best serve the children." Id. The shared custody arrangement imposed here does not provide the framework that best serves the child. The district court abused its discretion in ordering shared custody.
[¶ 44] Neither party appealed the district court's order granting Mother primary physical custody for final decision-making authority. Consequently, that order remains in effect. We reverse the district court's shared custody order and remand with directions to enter an order consistent with this opinion awarding Mother primary physical custody, and Father reasonable visitation taking into consideration the geographic distance between the parties. In addition, the district court will need to re-calculate the presumptive child support obligation on the basis of this new custody arrangement.[8]
NOTES
[1] The parties and the district court use different terminology than that generally used in custody proceedings in Wyoming. We have commented before in the context of a case involving joint custody that loose use of the language causes confusion. Gurney v. Gurney, 899 P.2d 52, 54 n. 1 (Wyo.1995). The terms generally used by this Court are: legal custody, to denote the party or parties who have the authority to make decisions concerning health, education, etc.; physical custody, to denote the party or parties with whom the child lives; and visitation to refer to the noncustodial parent's right of access to the child. As used in Mother's complaint, we assume the term "parenting plan" refers to Father's visitation.
[2] We assume "co-parenting time" refers to visitation. See n. 1.
[3] No hearing transcript or order on the motions appears in the record. However, Mother states in her brief that the district court heard the motions on September 21, 2007, and ruled from the bench that the child was to remain in Laramie County and the parties were to share custody until the trial. Mother also states that the district court ordered the trial to be expedited.
[4] If the district court pressured Mother not to move to Alabama and to find a job in Wyoming or Colorado, this would be an improper restraint on her constitutionally protected right of travel. Testerman v. Testerman, 2008 WY 112, ¶ 18, 193 P.3d 1141, 1146 (Wyo.2008). However, Mother did not raise the issue and the hearing transcript is not part of the record. Therefore, we do not address the question of whether her right was violated.
[5] Ordinarily, final decision making authority is denoted as "legal custody" and primary custody refers to where the child resides. See n. 1.
[6] Consistent with this comment, the decree states "the parties are equally at fault for the breakdown of this marriage" and "the parties are granted an absolute divorce from each other."
[7] Neither party challenges the portion of the district court's order designating Mother as the primary custodial parent for final decision-making. The designation would seem to reflect the court's conclusion, consistent with the undisputed evidence, that Mother was the child's primary caretaker.
[8] Although neither party raised the issue, we are compelled to address the district court's finding that because of the de minimus amount of Father's child support obligation, i.e. $44.90, it was in the child's best interest to deviate from the presumed amount to zero. This finding, and the resulting order, are contrary to Wyo. Stat. Ann. § 20-2-304 (LexisNexis 2007), which creates a rebuttable presumption that the presumed amount is correct, and Wyo. Stat. Ann. § 20-2-307 (LexisNexis 2007), which allows deviation from the presumed amount when it would be unjust or inappropriate. The district court could not reasonably conclude the best interest of the child would be served by receiving no child support from Father. Nor could it reasonably conclude that the small amount made it unjust or inappropriate.