**Ronald Eldon TRIGGS, Appellant (Defendant),**

v.

**Carole Kincaid TRIGGS, n/k/a Carole Anderson–Kincaid, Appellee (Plaintiff).**

No. 95–195.

Supreme Court of Wyoming.

June 28, 1996.

Georg Jensen, Cheyenne, for Appellant.

Carole Anderson–Kincaid, Cheyenne, pro se.

Rhonda Sigrist Woodard, Burke, Woodard & Bishop, P.C., Cheyenne, Guardian ad Litem.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

THOMAS, Justice.

The primary issue in this appeal by Ronald Eldon Triggs (husband) is a claim that the district court erred in awarding custody of the minor daughters of the parties to Carole Kincaid Triggs (wife). Additional claims of error are asserted relating to distribution of the marital property of the parties and calculation of child support. The wife contends this court should certify there was no reasonable cause for the appeal and award her costs, damages, and reasonable attorney fees in connection with the appeal. The husband's contentions all depend upon establishing an abuse of discretion by the trial court. We hold the record in this case does not demonstrate an abuse of discretion with respect to any of the claims of error, but we are unable to certify there was no reasonable cause for the appeal. The Supplemental Decree of Divorce entered in the trial court is affirmed in all respects.

In his Appellant's Brief, the husband states the issues on appeal as:

1. Did the court err in awarding custody of the parties' minor daughters to the appellee (plaintiff below)?

2. Did the court err in the equitable distribution of property?

3. Did the court err in the calculation of child support under W.S. § 20–6–304?

In her Brief of Appellee, the wife, while generally accepting the above statement of the issues, additionally sets out a fourth issue as:

IV. Should the Court certify that there was no reasonable cause for this appeal, that it was without merit, and find it was filed only to harass Appellee, delay resolution of the case, and add to the costs of the litigation?

The guardian *ad litem* submitted a brief addressing the single question of custody because the husband has disagreed with the recommendations made by the guardian *ad litem*.

The wife commenced this divorce action on November 30, 1993, after almost seventeen years of marriage. In addition to seeking a divorce, she requested temporary and permanent custody of the three minor children of the marriage, one son and two daughters. In his answer and counterclaim, the husband requested custody of the children, and he asserted the wife "is an unfit custodian of the minor children in that she has been emotionally, verbally and physically abusive towards all three children." Pursuant to a decision letter filed December 22, 1993, the trial court awarded the wife, during the pendency of the case, temporary custody of the children, temporary use of the marital home, and family support of $2,000 per month and set up a visitation schedule for the husband.

The participation of the parties in this litigation was vigorous, and numerous pleadings, with supporting documentation, were filed by both the husband and the wife. In February 1994, the court appointed the guardian *ad litem* to represent the interests of the children in this dispute. At that time, temporary custody of the minor son was placed with the husband because the boy preferred to be with his father and was having difficulty with his mother. Following another exchange of motions and a hearing to consider them collectively, the trial court ordered visitation be suspended, unless requested by the children; counsel for the parties were not to communicate with the children without prior approval from the guardian *ad litem;* the parties were ordered to refrain from attempting to influence the position of the children with respect to custody and visitation; and the court concluded to

appoint a custody evaluator after receiving advice from the guardian *ad litem.* In April, two experts on custody and visitation issues were appointed by the court.

On April 5, 1994, an absolute divorce was granted to the wife, with the court reserving decision on custody, child support, and property issues for a later determination. The parties continued to dispute their respective compliance with the orders of the court, and the trial was continued until November 7, 8, and 9, 1994 because the custody evaluations would not be finished until sometime in mid-September. Additional pleadings included pretrial memoranda and financial affidavits by both the husband and the wife. After the trial was held in November, closing statements were submitted in writing to the court. The court prepared a detailed decision letter which was sent to the attorneys for the parties and the guardian *ad litem* on December 13, 1994. The letter settled child custody, determined the income for each of the parties, computed the share for each party of presumed child support, settled health insurance obligations, made a division of the marital property and indebtedness of the parties, and awarded alimony to the wife.

Even though the decision letter had been entered, voluminous pleadings continued to be filed with the court. On March 22, 1995, the Supplemental Decree of Divorce, consistent with the decision letter and incorporating it by reference, was filed. The wife retained custody of the two daughters, and the husband continued to have custody of the son. The court required the parties to pursue counseling in an effort to have them accept responsibility for, and hopefully to relieve, the alienation each of the children felt toward the noncustodial parent. The court required the children to continue with counseling sessions, dividing costs between the parties. The order provided visitation between the noncustodial parent and the children was to begin only when the children's counselor believed the visits would be beneficial, rather than detrimental. The children were granted unrestricted access to each other at any time.

With respect to child support, the husband was ordered to pay $574 per month based upon the split custody and the amounts set forth in the presumed child support guidelines. The payments were to continue until each child reached the age of majority. The husband was to continue health and medical insurance coverage for the children, and the decree provided any medical expenses not covered by insurance would be divided between the parties equally. The court ruled the wife should generate some income, but awarded her $1,200 monthly alimony from the husband for a period of eight years. Each of the parties was required to submit yearly financial affidavits by April 15, and the husband was granted the federal income tax dependent deductions for all of the children for 1994, 1995, and all future years, subject to a change in the wife's income.

The marital home was awarded to the wife, subject to the mortgage, and the husband's law practice was awarded to him. The decree provided the wife should receive 40% of the husband's military retirement, and the husband's three retirement-type accounts were impressed with a trust to fund college educations for the children. The decree provided any life insurance coverage on either party was to be irrevocably designated for the benefit of the children. The wife was required to pay the appearance fee of the court reporter at the trial, and the husband was required to pay remaining fees for the guardian *ad litem* and the custody evaluators. The remainder of the personal property was divided between the parties.

The husband filed a Notice of Appeal on April 20, 1995. He contends there is error in the decree with respect to determination of custody, amount of child support, and distribution of property.

■■■ Our rule is that the determination of the trial court with respect to custody and visitation, the trial court's calculation of income for purposes of child support, and the trial court's division of the marital property, together with its allocation of attorney fees and costs, will not be overturned on appeal unless the record demonstrates a clear abuse of discretion. *Dowdy v. Dowdy,* 864 P.2d 439 (Wyo.1993); *Love v. Love,* 851 P.2d 1283 (Wyo.1993); *Goff v. Goff,* 844 P.2d 1087 (Wyo.1993); *Marquiss v. Marquiss,* 837 P.2d

25 (Wyo.1992). Reasonable conclusions of the trial court based upon the evidence are not to be disturbed on appeal, and reversal is mandated only when the judgment of the trial court exceeds the bounds of reason or constitutes an error of law under the circumstances. *Combs v. Sherry–Combs,* 865 P.2d 50 (Wyo.1993). Upon review, we evaluate the sufficiency of the evidence to support the trial court's decision by affording to the prevailing party every favorable inference while omitting any consideration of evidence presented by the unsuccessful party. *Cranston v. Cranston,* 879 P.2d 345 (Wyo.1994).

■ We deal initially with the claim of error concerning child custody because that seems to have been a major point of contention between the parties. As we have noted, the trial court's determination of custody and visitation issues is subject to an abuse of discretion standard. We have said abuse of discretion is present "when a material factor deserving significant weight is ignored." *Vanasse v. Ramsay,* 847 P.2d 993, 996 (Wyo. 1993). The husband, on appeal, continues to assert the wife abused the three children, both physically and mentally, and he argues the custody evaluators and the guardian *ad litem* were derelict in failing to develop evidence of that abuse. In connection with custody of children, abuse is a material factor deserving significant weight, and a disclosure by the record of abuse by the wife could lead to the conclusion that the trial court abused its discretion in awarding her custody of the two minor daughters. Clearly, an award of custody to an abusive parent is not to be considered in the best interests of the children. *Fanning v. Fanning,* 717 P.2d 346 (Wyo.1986); *Bereman v. Bereman,* 645 P.2d 1155 (Wyo.1982). A conclusion that the trial court ignored such a critical factor, however, depends upon more than innuendo and allegations.

In this instance, two trained, professional custody evaluators were hired at the request of the husband, and the two of them worked as a team in preparing the report. At trial, one of the evaluators furnished the following information upon direct examination by the husband's attorney:

Q. Now, in cases of abuse, isn't there also—I don't know if I can call it a principle, but perhaps a school of thought—and you can correct me and please do—where often an abused child will gravitate toward the abusing parent?

A. Identification with the aggressor. It's called a trauma bond in the current literature.

Q. Well, isn't that something that very likely could happen with these artificial circumstances that have been created in this case, where the girls are with their mother—only with their mother—don't have any contact or are cut off from contact with their father, and if in fact there is abuse going on, that they then identify with their mother as the aggressor, that they have to take her side and become part of her emotions and her feelings and exert those outwardly to others, otherwise they themselves find a lack of any protection?

A. I know what you're saying. I didn't feel that that was true because even in trauma bonding, you know, identification with the aggressor, there is an element of fear and anxiety that clinically you see coming through with the kids. And I didn't see and didn't assess any element of the children having fearfulness of their mother, frightened of her, fear about saying anything, of some kind of pathological need to deny feelings about her. They just didn't appear to me clinically to have that quality.

So in my opinion, I didn't see that that was true.

The following testimony was developed on cross-examination of the evaluator:

Q. I want to ask you basically what—did you observe any evidence other than what Andy told you about any abuse that may have occurred rightfully or wrongly by the plaintiff on the children, by Mrs. Triggs on the children?

A. Well, only clinical evidence, which would be Andy indicating that it happened, Mr. Triggs indicating it happened, Eldon Triggs [Mr. Triggs' son by a previous marriage] indicating it never happened, Mrs. Triggs saying it never happened, the girls

indicating it never happened. So that's our diametric view.

Q. All right. The girls never indicated, as I understand now, that—they have not indicated to you that they were abused by their mom?

A. No. Eldon Triggs mentioned to me that on a couple of occasions other than the mother pulling the girls into a bedroom to have a heavy talk with them, that he never observed anything.

Q. All right. The girls never indicated to you that they were abused, right?

A. No, no. They spoke of no abuse.

The evaluator who so testified is a family and child psychologist who has performed over 300 custody evaluations.

Other evidence was elicited upon direct examination by the wife's attorney from the clinical psychologist who worked with the two daughters. That witness had this to say:

Q. During any of the counseling have you ever obtained any evidence that would indicate to you that Mrs. Triggs was physically abusive to the girls?

A. No.

Q. Have you obtained any evidence or through your care and treatment of them—any evidence that she was emotionally or verbally abusive to the girls?

A. No.

Q. Have the girls reported to you at any time that their mother is or has verbally or physically or emotionally abused them?

A. I would say that this family, as a whole, is more verbally interactive than a lot of families. There are different norms from one family to the next, and so I would say that I have seen times when the girls or their mother were having, shall we say, spats or disagreements, conflicts, and these girls are teenagers. But I, at no time, have seen anything that concerned me. I've never felt that Mrs. Triggs was not a fit mother.

The trial court was confronted with opposing information. The husband and the son testified the wife was guilty of child abuse. The wife, her two daughters, and her stepson testified no abuse had ever occurred. The professionals, who were trained to uncover evidence of child abuse, were unable to find any was present.

There was significant evidence on the two sides with respect to alienation of the affection of the children. Again, the wife and the daughters were opposed to the father, and the father and the son to the mother. The following testimony is illustrative of the situation:

Q. There has been some discussion in your report about the parents in this case possibly contributing to the alienation that the children have felt from the other parent.

Can you describe that for the Court? What did you find regarding that issue?

A. Well, there are a couple ways of assessing it. One is just from what the children say and through the children's own reports of what they observed across the families. That was very evident through what Andy would say about his mother and it was very evident that he had talked with his father and knew his father's feelings about the mother.

The girls were aware of the father's feelings about mother. The girls were aware of mother's rejection of the father. The children are very aware of the parental hatred in this family. That's one way of assessing it.

The other way of assessing it is simply what the parents say about each other. In the clinical interview they were very demeaning and degrading of the other parent and had grave disrespect for them.

The third way of assessing it is when the children are in alienation, they will not find one thing good about their noncustodial parent. No matter what. And in this case, regardless, in the clinical interview the father attempts to connect with them, which at times they were sensitive and tuned in, they would never allow it. With Andy and his mother, despite her caring attempts to connect with him, he would never allow it.

When I saw these children alone, I purposefully exaggerated the negative qualities of each of their parents, the opposite parent. They agreed with them. **Chil-**

dren *who are involved in alienation of the other parent will agree with anything negative you say about that parent.* Children who don't do that will be more hurt and they will correct your perception.

\*　\*　\*　\*　\*　\*

So, by most criteria that we know, these parents do not like each other or respect each other. The children know it and it's contributed to this major split in the families. (Emphasis added.)

The evaluator recommended the daughters remain in the custody of the mother and the son remain in the custody of the father. The evaluator also recommended the children be allowed to visit with each other whenever they wanted to, but any visitation between the mother and the son or the father and the daughters should not be undertaken at that time. Further, the evaluator recommended counseling for the entire family until such time as each of the children could begin to understand and accept the noncustodial parent. In the Supplemental Decree of Divorce, the trial court incorporated the suggestions of the experts from the record brought to us, including the evidence adduced at trial. We hold there was no abuse of discretion by the trial court in its determination of custody and visitation.

■■■ The second contention of error relates to the division of the property of the parties. A trial court is required to "make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children." WYO. STAT. § 20-2-114 (1994). Our rule with respect to this decision by a trial court is that it is a determination subject to the exercise of discretion, and an abuse of that discretion is to be found only if the division of property appears so unfair, inequitable, or unconscionable that reasonable persons could not abide it. *Neuman v. Neuman,* 842 P.2d 575 (Wyo.1992); *Grosskopf v. Grosskopf,* 677 P.2d 814 (Wyo.1984).

The husband complains, in attacking the distribution of property by the court, apart from the obligation imposed upon him to pay alimony for eight years, that "the court erred in not providing for a distribution of the equity in the marital residence, in allowing the plaintiff [wife] to continue to utilize the GI loan benefits of the defendant [husband], precluding him from buying another home until the age of 76 years." The husband was awarded a value attributed to his law practice, which included $57,414 for furniture and equipment, cash at the time of the divorce, and accounts receivable. The court considered the $57,414 was appropriate for division in the property settlement, and it also considered the equity of $40,900 in the marital home was subject to distribution.

Instead of requiring a partition of the law firm assets and the equity in the home, however, the court chose to award the home with its equity to the wife, subject to remaining indebtedness. The law practice with its assets and receivables was awarded to the husband. It would appear the time frame required for sale of the marital home and the collection of the law firm receivables so the proceeds could be divided between the parties would have simply prolonged the animosity and hostility between each of the children and the noncustodial parent. The husband is not foreclosed from buying a home for himself and his son at any time. It is true he may not be able to obtain a Veterans Administration insured loan, but we cannot discern an abuse of discretion by the trial court in this regard. Further, we see no apparent abuse of discretion as to the division of the property between the parties.

■■ The third claim of error by the husband relates to the calculation of child support. In determining child support, because the income of the parties did fluctuate, the trial court invoked a five-year average to determine the monthly net income of both husband and wife. *See Madison v. Madison,* 859 P.2d 1276 (Wyo.1993) (the court averaged the father's income over a four-year period). The statute incorporating Wyoming's child support guidelines defines the word "income" as:

"Income" means any form of payment or return in money or in kind to an individual, regardless of source. Income includes, but is not limited to wages, earnings, salary, commission, compensation as an independent contractor, temporary total disability, permanent partial disability and permanent total disability worker's compensation payments, unemployment compensation, disability, annuity and retirement benefits, and any other payments made by any payor, but shall not include any earnings derived from overtime work unless the court, after considering all overtime earnings derived in the preceding twenty-four (24) month period, determines the overtime earnings can reasonably be expected to continue on a consistent basis. In determining income, all reasonable unreimbursed legitimate business expenses shall be deducted. Means tested sources of income such as Pell grants, aid to families with dependent · children (AFDC) basic grants, general assistance (GA), food stamps and supplemental security income (SSI) shall not be considered as income. Gross income also means potential income of parents who are voluntarily unemployed or underemployed; * * *.

WYO. STAT. § 20–6–301(a)(i) (1994).

The husband contends, under this definition, the court should have included in the calculation of the wife's monthly income gifts of cash and vehicles she had received from her parents. According to the husband's calculations, the vehicles had a value of $21,-000, and the cash gifts amounted to $3,180 annually, or $265 of additional monthly income. The trial court refused to accept these assertions and found, from the evidence of gifts to the wife, that it "does not demonstrate them to be sufficiently certain in the future to include them as income for her."

In Maryland and Minnesota, the courts have ruled gifts must be considered in determining the amount of a parent's child support obligation. In 1994, the Maryland court held the value of noncash items given to a parent could be imputed as actual income for child support purposes. *Petrini v. Petrini*, 336 Md. 453, 648 A.2d 1016 (1994). In Minnesota, a husband who received $833 monthly from his father and $5,000 from his grandmother on every birthday, Easter, and Christmas was required to include those amounts as income. The court ruled a gift regularly received from a dependable party may be considered in determining a parent's child support obligation. *Barnier v. Wells*, 476 N.W.2d 795 (Minn.Ct.App.1991).

An opposing view is found in other jurisdictions. There, the courts have refused to consider gifts as income to a parent for purposes of calculating child support obligations. The rationale for refusing to include gifts for this purpose is that the donors have no legal obligation to continue with the practice of making gifts. *See In Re Marriage of Harmon*, 210 Ill.App.3d 92, 154 Ill.Dec. 727, 568 N.E.2d 948 (1991); *True v. True*, 615 A.2d 252 (Me.1992); *Ikard v. Ikard*, 819 S.W.2d 644 (Tex.Ct.App.1991) (holding gifts cannot be considered as income to the recipient unless the donor has a legal obligation to make them). In a case very similar to this case, the Florida Court of Appeals reversed a trial court's imputation of income to the wife based upon historical gifts from her parents. *Shiveley v. Shiveley*, 635 So.2d 1021 (Fla.Ct. App.1994). A New York court ruled the testimony of a father that his wife's mother had given them annual gifts during the term of their marriage was not sufficient to impute income to the wife for purposes of calculating child support. *Huebscher v. Huebscher*, 206 A.D.2d 295, 614 N.Y.S.2d 524 (N.Y.App.Div. 1994). The New York court noted that, since there was no legal obligation to continue with the gifts, there was no guarantee they would be made in the future.

■ Our legislature has not specifically defined "gift" as a source of income in calculating child support obligations. Instead, in WYO. STAT. § 20–6–302 (1994), our legislature specifically has authorized the court to deviate from the presumptive child support calculations. We conclude the intent of the legislature was to afford a trial court flexibility in considering any and all sources of income before it calculates support obligations. *See Pauling v. Pauling*, 837 P.2d 1073 (Wyo. 1972) (holding trial court's deviation from support guidelines in modifying an existing

order refuted proposition the legislature enacted guidelines to curb the court's discretionary authority). We conclude that, in Wyoming, the trial court is afforded discretion to include or not include historical gifts as a source of income, and we are limited on review to a consideration of whether the court abused its discretion in ruling the gifts to the wife were so uncertain as to preclude their inclusion in a calculation of monthly income.

We discern no abuse of discretion by the trial court in this regard. The cash gifts to the wife, valued at $265 monthly by the husband, were voluntary transfers to the wife from her parents. There was no consideration furnished on her part, and the trial court had no way of determining the period of time the gifts would continue or what the level of giving would be. With respect to the value of $21,000 the husband ascribed to the vehicles given to the wife, that valuation does not account for depreciation, present condition, and marketability of the vehicles. Further, the vehicles were not liquid assets, and we perceive, again, no abuse of discretion on the part of the trial court in refusing to include their value as income in calculating the wife's portion of the joint child support.[1]

 While not directly contesting the provision in the Supplemental Decree of Divorce that he pay $1,200 in monthly alimony, the husband contends this amount should be included in the wife's income for purposes of determining her share of the joint child support obligation. As a New Jersey superior court has held, the policy behind an award of alimony is to provide the dependent spouse with a standard of living comparable to what that spouse enjoyed during the term of the marriage, not to support the children. *Koelble v. Koelble*, 261 N.J.Super. 190, 618 A.2d 377 (1992). The wife in the case before us received an award of rehabilitative alimony to permit her to continue her paralegal education. The alimony will cease after eight years and, at that time, the wife's new vocational skills should enable her to earn sufficient income to maintain a lifestyle commensurate with that she enjoyed during the marriage.

In *Koelble*, 618 A.2d at 380, the court noted the New Jersey child support guidelines contemplated "that a noncustodial parent who receives alimony may be required to bear his or her fair share of the child support guidelines." The court went on to say, while spousal support from past relationships should be included in the child support calculations of a parent, "alimony is to be **excluded** if it is being received from the supporting spouse." *Koelble*, 618 A.2d at 380 (emphasis added). In Indiana, the child support guidelines articulate the same concept in the definition of weekly gross income:

> For purposes of these Guidelines, "weekly gross income" is defined as actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed and imputed income based upon "in-kind" benefits. Weekly gross income of each parent includes income from any source, except as excluded below, and includes, but is not limited to, income from salaries, wages, commissions, bonuses, overtime, partnership distributions, dividends, severance pay pensions, interest, trust income, annuities, capital gains, social security benefits, workmen's compensation benefits, unemployment insurance benefits, disability insurance benefits, gifts, prizes, **and alimony or maintenance received from other marriages.**

IND. CODE ANN. Court Rules (Civil) Indiana Child Support Rules and Guidelines, Support Guideline 3., Determination of Child Support Amount (Burns 1996) (emphasis added).

---

1. We do point out that, even if the court had imputed additional income of $265 per month to the wife, her share of the joint child support would be only forty cents a month more than the minimum of $50 she was ordered to pay by the trial court in December 1994. The trial court's monthly child support calculations resulted in a $624 allocation to Mr. Triggs and the $50 minimum allocation, prescribed by the statute, to Mrs. Triggs. Under the trial court's calculations, the actual share Mrs. Triggs would pay, if there were no minimum, would have been $23.50. Adding the "gift" income of $265 monthly results in an allocation to Mrs. Triggs of $50.40. The minimum Mrs. Triggs would pay under Mr. Triggs' scenario is still "minimum," and Mr. Triggs would pay $619.15, a net decrease of $4.85.

The policy reason behind the judicial decision in Maryland and the legislative decision in Indiana is persuasive. The trial court could reasonably conclude the monthly alimony payment should not be included in the wife's income for purposes of child support. The court did not abuse its discretion in refusing to include it.

The husband's contention that the court should have attributed $600 in imputed income to the wife, based upon the minimum wage, was not appropriate. The $600 figure is not realistic because it is more than twice the earned income of $227 monthly. We cannot conclude the trial court abused its discretion in the computation of the wife's monthly income for child support purposes based upon a historical average of five years, rather than the imputed figure of $600 per month.

With respect to the wife's argument relating to a certification that the appeal is without merit and there were no reasonable grounds, we decline to make that determination. Consequently, we do not award attorney fees, costs, or damages as requested by the wife.

The husband has not carried his burden of persuasion with respect to abuse of discretion as to custody, distribution of marital property, or in calculation of appropriate child support. We affirm the district court's Supplemental Decree of Divorce.