# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 21

OCTOBER TERM, A.D. 2015

February 18, 2016

KELLI SUE WILLIAMS,

Appellant
(Plaintiff),

v.

S-15-0148

CHARLES LESLIE WILLIAMS,

Appellee
(Defendant).

*Appeal from the District Court of Crook County*
*The Honorable Michael N. Deegan, Judge*

*Representing Appellant:*
Christopher M. Wages of The Wages Group, LLC, Buffalo, Wyoming.

*Representing Appellee:*
Matthew R. Sorenson and Tad T. Daly, Daly & Sorenson, LLC, Gillette, Wyoming.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FOX, Justice.**

[¶1]   Kelli Sue Williams (Mother) and Charles Leslie Williams (Father) were married for nearly five years and had one child together when Mother filed for divorce in the spring of 2014.  The parties each sought custody of the minor child, and requested an equitable division of the marital assets and liabilities.  The district court ordered the parties to share physical custody of the child, alternating between Moorcroft (Father's residence) and Cheyenne (Mother's residence) until the child reached school-age, at which time primary physical custody was awarded to Mother.  The court awarded the parties' cattle operation to Father and awarded Mother 15 percent of its value to be paid in yearly installments by Father.  Mother appealed, and we affirm the district court's distribution of property, but reverse the district court's shared custody order.

## *ISSUES*

[¶2]   We restate the issues as follows:

1.   Did the district court abuse its discretion when it ordered shared custody?

2.   Did the district court abuse its discretion in its division of the marital assets and liabilities?

## *FACTS*[1]

[¶3]   The parties married on August 15, 2009, and had one child together, NJW, who was born in 2012.  The family resided in Crook County, Wyoming—north of Moorcroft—until Mother left the marital home with the parties' daughter in the spring of 2014.  She then filed for divorce, and moved for temporary custody of NJW.  The district court held a temporary custody hearing on May 27, 2014.  At its conclusion, the court ruled from the bench, ordering a shared custody arrangement in which physical custody of the child would alternate between the parents every two weeks.  Mother moved to Cheyenne after the temporary custody hearing, and NJW was shuttled between Moorcroft and Cheyenne in accordance with the court's temporary custody order.  The court bifurcated the divorce trial, hearing the custody dispute on September 3, 2014, and issues related to property division on December 19, 2014.  At the conclusion of the custody hearing, the court continued the temporary custody arrangement, ordering that the parents alternate physical custody of the child every two weeks.  The court awarded primary physical custody to Mother, upon NJW reaching school-age, and granted Father liberal visitation.  At the hearing on division of the marital estate, the court awarded Father most of the parties' property, and required Father to compensate Mother in the form of an equalizing payment of $167,509.00 to be paid in equal installments over a period of ten

---

[1] Additional facts will be addressed in the discussion section of the opinion.

1

years. The court found that no interest should attach to the payments unless and until Father missed a yearly installment. Mother timely filed her notice of appeal.

## DISCUSSION

### I. Did the district court abuse its discretion when it ordered shared custody?

[¶4] NJW was born in 2012, and soon after her birth, the parties learned that she had a hearing disability. At the time, both Mother and Father worked as teachers at Moorcroft high school. Mother took the remainder of the school year off to care for NJW. During the summer, the parties decided that Mother would reduce her hours at the school and begin working part-time to give Mother the time and opportunity to address any challenges that may arise due to NJW's hearing disability. Soon after NJW's first birthday, she received cochlear implants. While this enabled NJW to hear, she still required services, such as speech therapy, to assist with her development.

[¶5] At the start of the school term in the fall of 2012, Mother went back to teaching part-time, and Father continued as a full-time teacher. In addition to his teaching duties, Father also acted as a coach for both the junior high and high school wrestling programs. The parties also owned land and ran a ranching operation. Both before and after NJW's birth, Father spent a considerable amount of time working the ranch and growing the parties' cattle herd.

[¶6] Mother acted as the primary caregiver for NJW. She performed the day-to-day activities required to care for a child, including waking NJW in the morning, feeding her, taking her to the babysitter's house and picking her up, putting her to bed, and caring for her when she was ill. In addition, Mother scheduled and attended all of NJW's appointments, which were substantial due to NJW's hearing disability. Mother arranged and participated in NJW's speech therapy lessons, she coordinated NJW's developmental services, and she also arranged a community sign language course to ensure that NJW was able to communicate with family, friends, and neighbors. Mother became adept at sign language, and also became actively involved in the deaf community, joining the Hands and Voices board, an organization that works with parents of children with hearing disabilities.

[¶7] The majority of Father's time was spent working. Often, Father would leave the house early in the morning and return late in the evening, due to his coaching schedule, teaching obligations, and ranching duties. During wrestling season, Father was gone most weekends, and Mother testified that it was not uncommon for NJW not to see her Father for entire days at a time. Father was not responsible for scheduling any of NJW's appointments, nor was he responsible for ensuring that services related to NJW's developmental needs were being provided.

[¶8]     Father testified that during the temporary custody period, he spent considerably more time with NJW. While NJW was with Father, she continued to receive speech therapy, and because the temporary arrangement was in the summer months when Father had no teaching or coaching obligations, he was able to attend most of these sessions. Father testified that while he was working on the ranch during the summer, NJW's grandmother (Father's mother) cared for NJW, and this arrangement was to continue when Father went back to teaching and coaching in the fall. Grandmother testified that during the temporary custody period, she cared for NJW beginning in the morning until about five o'clock in the evening. Grandmother also testified that she was exploring various services for NJW, including daycare and other activities. Because Father lived close to his parents and other family members, NJW was able to spend time with her extended family while with Father in Moorcroft.

[¶9]     Mother obtained a teaching job in Cheyenne after her move. Because she did not begin her new teaching contract until the fall following the court's temporary custody order, Mother was able to spend her entire custody periods with NJW. Mother also enrolled NJW in the STRIDE program in Cheyenne, which provided NJW with intensive developmental services and allowed NJW to socialize with other children who had cochlear implants. Mother testified that when she began work in the fall, NJW would attend daycare/preschool during the day, but that Mother would be available to care for NJW directly after school. In addition, Mother had family support in the form of her sister and her sister's family who also reside in Cheyenne.

[¶10] Mother and Father both testified concerning the workability of a shared custody arrangement, and how NJW had adjusted during the temporary custody period. Father stated that the arrangement was working well, and requested that the court continue the shared custody schedule. Mother, however, testified that she had witnessed some behaviors in NJW related to separation anxiety due to NJW's long absences from Mother's care. Father admitted that NJW suffered from some separation anxiety when she was away from Mother, but he believed that these symptoms were lessening over time.

[¶11] The parties testified about some substantial disagreements they had during the temporary custody period. Chiefly, these centered upon developmental services for NJW. Mother testified that one of the primary reasons for her move to Cheyenne was the STRIDE program which came highly recommended by NJW's providers. Father initially objected to NJW's enrollment in the program, and the parties were unable to come to an agreement until Father toured the STRIDE center. A similar disagreement occurred over NJW's enrollment in the Scottish Rites program which provides additional speech therapy, and which was again recommended by NJW's providers. Father objected to her enrollment in the program, and at the time of trial, the parties had not reached a resolution on this matter.

3

[¶12] At the close of evidence, the district court ruled from the bench, granting joint legal custody to the parties and ordering a continuation of the shared custody arrangement. The court awarded primary custody to Mother upon NJW attaining school-age. Mother appealed and we reverse and remand.

[¶13] We review custody determinations for an abuse of discretion. *Durfee v. Durfee*, 2009 WY 7, ¶ 6, 199 P.3d 1087, 1089 (Wyo. 2009).

> Custody, visitation, child support . . . are all committed to the sound discretion of the district court. *Scherer v. Scherer*, 931 P.2d 251, 253-54 (Wyo. 1997); *Triggs v. Triggs*, 920 P.2d 653, 657 (Wyo. 1996); *Basolo v. Basolo*, 907 P.2d 348, 352 (Wyo. 1995). It has been our consistent principle that in custody matters, the welfare and needs of the children are to be given paramount consideration. *Scherer*, 931 P.2d at 254; *Rowan v. Rowan*, 786 P.2d 886, 890 (Wyo. 1990); *see also Gurney v. Gurney*, 899 P.2d 52, 55 (Wyo. 1995) and *Fink v. Fink*, 685 P.2d 34, 36 (Wyo. 1984). The determination of the best interests of the child is a question for the trier of fact. "We do not overturn the decision of the trial court unless we are persuaded of an abuse of discretion or the presence of a violation of some legal principle." *Fink*, 685 P.2d at 36.
>
> A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. *Pinther v. Pinther*, 888 P.2d 1250, 1252 (Wyo. 1995) (quoting *Dowdy v. Dowdy*, 864 P.2d 439, 440 (Wyo. 1993)). . . . Findings of fact not supported by the evidence, contrary to the evidence, or against the great weight of the evidence cannot be sustained. *Jones v. Jones*, 858 P.2d 289, 291 (Wyo. 1993). Similarly, an abuse of discretion is present "'when a material factor deserving significant weight is ignored.'" *Triggs*, 920 P.2d at 657 (quoting *Vanasse v. Ramsay*, 847 P.2d 993, 996 (Wyo. 1993)).

*Pahl v. Pahl*, 2004 WY 40, ¶ 6, 87 P.3d 1250, 1252 (Wyo. 2004) (quoting *Reavis v. Reavis*, 955 P.2d 428, 431 (Wyo. 1998)).

[¶14] Mother contends that the district court abused its discretion when it failed to give adequate weight to Father's misconduct during the marriage, and when it erroneously determined that Father shared in the role as primary caregiver for NJW. Mother also argues that the court's decision to order shared custody was an abuse of discretion. We defer to the district court's determination regarding Father's transgressions and his ability

4

to parent NJW.  However, we find that the district court erroneously found that Father's status as primary breadwinner for the family conferred primary caregiver status upon him as well.  The district court also abused its discretion when it ordered shared custody.  We therefore reverse and remand.

[¶15]  We have recognized that

> the district court's responsibility for fashioning family relationships through custody determinations encompasses one of the most difficult and demanding tasks assigned to a trial judge.  "This life-altering decision is perhaps most exacting in cases such as this, where it is apparent that both parents love their children and are fit and competent to have custody."  Beyond the emotional and family turmoil that attends custody disputes, adding to the district court's difficulty is that every case involving custody issues presents a different situation and set of facts.  Consequently, there are no bright line rules to easily apply when making a custody decision.  Instead, every case requires a careful weighing of the relevant factors.  The district court must look to the unique family relationships of each case in order to reach a resolution that is in the best interests of the children in that particular family.  The law recognizing the different intricacies and circumstances of each case, affords the district court wide discretion when fashioning custody and visitation provisions.

*Pahl*, 2004 WY 40, ¶ 9, 87 P.3d at 1253 (citations omitted).

[¶16]  The law sets forth certain factors that the district court must consider in exercising its discretion to devise a custody arrangement in the best interests of the child:

> (a)  In granting a divorce, . . . the court may make by decree or order any disposition of the children that appears most expedient and in the best interests of the children.  In determining the best interests of the child, the court shall consider, but is not limited to, the following factors:
>> (i)     The quality of the relationship each child has with each parent;
>> (ii)    The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed;

(iii)    The relative competency and fitness of each parent;

(iv)    Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times;

(v)     How the parents and each child can best maintain and strengthen a relationship with each other;

(vi)    How the parents and each child interact and communicate with each other and how such interaction and communication may be improved;

(vii)   The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to privacy;

(viii)  Geographic distance between the parents' residences;

(ix)    The current physical and mental ability of each parent to care for each child;

(x)     Any other factors the court deems necessary and relevant.

Wyo. Stat. Ann. § 20-2-201(a) (LexisNexis 2015).   Taking these and other relevant factors into consideration, the court must look to the totality of the evidence, and fashion a custody arrangement in the best interests of the child. *Buttle v. Buttle,* 2008 WY 135, ¶¶ 23-25, 196 P.3d 174, 180 (Wyo. 2008).

[¶17]  In reaching its decision, the district court analyzed these factors, and determined that the parties were essentially equal in their parenting abilities.  Despite finding that Father had engaged in "sophomoric behavior," which entailed having a party late at night while Mother and NJW were sleeping, the court determined that Father was fit to care for NJW.

> [T]he ultimate point I want to make is all of those attributes, I am not going to hold against you in any very strong way with respect to the custody question because I haven't heard any evidence that any of that negatively impacts the way in which you care for your child, which to me is the real question before the court.  They are paling and there was never -- there is no evidence they would in any direct sense affect your parenting of the child.  I -- that's just the determination I have made here.

6

It is within the court's discretion to determine how to weigh the relevant statutory factors. *Jackson v. Jackson*, 2004 WY 99, ¶ 16, 96 P.3d 21, 27 (Wyo. 2004). The district court's decision to give little weight to Father's behavior is not an abuse of discretion. The evidence presented at trial supports the court's finding that Father is capable of caring for NJW despite some poor decisions made during the parties' marriage. The district court did not abuse its discretion in finding Father to be a fit and competent parent.

[¶18] Mother takes issue with the district court's treatment of the spousal abuse that occurred during the marriage. Wyo. Stat. Ann. § 20-2-201(c) (LexisNexis 2015) provides: "The court shall consider evidence of spousal abuse or child abuse as being contrary to the best interest of the children. If the court finds that family violence has occurred, the court shall make arrangements for visitation that best protects the children and the abused spouse from further harm." Mother argues that the court failed to apply this provision. However, the record clearly demonstrates that the court did consider the evidence presented concerning spousal abuse. It found that spousal abuse had occurred, but determined that Father was "evolving," and that "to the extent it existed and did exist . . . that it is not there anymore." As we said in *Buttle*:

> [W]e do not minimize the seriousness of spousal abuse. We are cognizant of the effects domestic violence and spousal abuse can have on the victim and family. As we have said before, we are particularly aware of the negative effects this sort of violence can have on children. *Jackson v. Jackson*, 2004 WY 99, ¶ 17, 96 P.3d 21, 27 (Wyo. 2004). However, in determining custody in the best interest of a child, evidence of spousal abuse is only one of the factors district courts are required to consider.

*Buttle*, 2008 WY 135, ¶ 23, 196 P.3d at 180. Here, the district court did consider the evidence of spousal abuse, and it did not abuse its discretion when it declined to base its custody decision on the evidence of abuse.

[¶19] Mother also contends that the district court erred when it found that the parties shared the role of primary caregiver to NJW. We have made clear that the question of which parent filled the role of primary caregiver is an important consideration in determining custody. *LRD v. DAH (In re Paternity of JWH)*, 2011 WY 66, ¶ 13, 252 P.3d 942, 948 (Wyo. 2011); *Buttle*, 2008 WY 135, ¶ 37, 196 P.3d at 182; *Testerman v. Testerman*, 2008 WY 112, ¶ 9, 193 P.3d 1141, 1144 (Wyo. 2008); *Pahl*, 2004 WY 40, ¶¶ 13-14, 87 P.3d at 1254-55; *Raymond v. Raymond*, 956 P.2d 329, 332 (Wyo. 1998); *Reavis*, 955 P.2d at 433. A parent's role as the primary caregiver is a weighty factor that the court must consider when fashioning a custody arrangement that is in the best

interests of the child. *In re Paternity of JWH*, 2011 WY 66, ¶¶ 11-13, 252 P.3d at 947-48. While primary caregiver status is not determinative, it is a crucial factor in many custody disputes.[2] *Id.*

[¶20] In discussing the issue of which parent acted as the primary caregiver for NJW, the district court stated:

> Another factor the court needs to take consideration of, which really isn't elicited here, but again, the supreme court has urged this. And I think again it is appropriate, it is who has been the primary caregiver. Now, maybe I am wrong in saying this, but I take a broader view of that language than simply the person who changes the diapers and nurtures the child, gives the child food, and wakes up at night when the child is crying. That is highly important. There is no doubt about that. But I think a father who is out there working, working, working, may be one step removed, but he is also a strong contender for being a caregiver, because in many instances, he is providing the wherewith all [sic] to enable buying the formula, buying the diapers. So I take a little bit broader view of that . . . .
>
> So, although in the strict sense of the term, I guess you would say mom was the primary caregiver, and in the broader sense of the term I think that role was shared.

[¶21] This Court has never defined the term "primary caregiver." However, our precedent indicates that the term denotes the parent who is primarily responsible for the hands-on, day-to-day care of the child. *Buttle*, 2008 WY 135, ¶ 8, 196 P.3d at 177 (undisputed evidence showed mother was the primary caregiver in that she woke the child in the morning, got him ready, took him to daycare, picked him up after work, bathed him, and put him to bed each night); *Testerman*, 2008 WY 112, ¶ 9, 193 P.3d at 1144 (mother was primary caregiver as father "had very little responsibility for or experience with caring for his daughter"). The undisputed evidence at trial demonstrated that Mother filled that role. While Father did play the role of primary breadwinner as the district court determined, his ability to provide financially for the family, alone, does not

---

[2] We have recognized in other cases that a party's status as primary caregiver is not the deciding factor in a custody dispute. Instead, primary caregiver status is one factor, though a weighty one, that a district court must consider in devising a custody arrangement in the best interests of the child. *Walter v. Walter*, 2015 WY 53, ¶¶ 10-12, 346 P.3d 961, 965 (Wyo. 2015); *In re Paternity of JWH*, 2011 WY 66, ¶ 11, 252 P.3d at 947.

grant him primary caregiver status.[3] The evidence demonstrated that Father was not often home caring for NJW due to his multiple responsibilities outside of the home, and his desire to maintain a similar social life to that he had before marriage. If we were to adopt the broad definition of "primary caregiver" utilized by the district court, the term would lose all meaning, and become useless as a tool for deciding custody disputes. In this case, the district court abused its discretion by failing to give appropriate weight to the fact that Mother acted as NJW's primary caregiver throughout her life, and finding, contrary to the evidence, that Father shared in the role of primary caregiver. *See Reavis*, 955 P.2d at 433 (finding that the district court abused its discretion when it failed to consider "the children's dependence on Mother as the primary caregiver, which was consistent throughout the children's lives"); *see also Pahl*, 2004 WY 40, ¶ 6, 87 P.3d at 1252 ("[A]n abuse of discretion is present when a material factor deserving significant weight is ignored." (citations and internal quotations omitted)).

[¶22] The district court justified its decision to order shared custody, at least in part, on its determination that the parents shared the role of primary caregiver. The court's abuse of discretion in its determination of primary caregiver status was therefore compounded when it determined that shared custody was in the best interests of NJW.

[¶23] The district court recognized that shared custody arrangements are not favored by this Court:

> There has been some discussion of the topic of shared custody, and the court is well familiar with the edicts of the Supreme Court on this subject. . . .
>
> Now, with all due respect to my superiors at the Supreme Court, the Supreme Court looks dimly upon split custody, shared custody. But the fact of the matter is the legislature of this state has included in this statute this language: Custody shall be crafted to promote the best interests of the children and may include any combination of joint, shared or sole custody.
>
> So it is not 100 percent verboten. I think the lesson to be taken from the Supreme Court cases, and probably appropriately so, is that if the court is going to do this, the court really needs to spell out how it is in the best interests of the child. There has to be evidence there to support that rather than just some ex cathedra, declaration of shared or

---

[3] This is not to say that a parent who is the primary breadwinner of the family cannot also be the primary caregiver. The two are not mutually exclusive—one parent can fulfill both roles.

9

split custody. And I can live with that. I mean, I have to live with it, and I don't know that I have much choice in the matter, nor do the attorneys.

We recognize that the statute allows for shared custody, Wyo. Stat. Ann. § 20-2-201(d) (LexisNexis 2015), and in some cases, shared custody may be in the best interests of the child. *See CAA v. ZWA (In re KRA)*, 2004 WY 18, ¶¶ 18-20, 85 P.3d 432, 437-38 (Wyo. 2004) ("[T]he record demonstrates good reason that shared custody is in KRA's best interests, and that shared custody most closely approximates the former family relationship."). However, this is not such a case.

[¶24] In determining whether shared custody is appropriate, we have urged district courts to consider a number of factors, including the ability of the parents to communicate and cooperate, the geographic distance between the parents' residences, *Buttle*, 2008 WY 135, ¶¶ 38-39, 196 P.3d at 183, and whether a shared custody arrangement most closely approximates the family relationship prior to the parents' separation, *Reavis*, 955 P.2d at 433. The district court disregarded or failed to consider these factors in ordering shared custody. Instead, the district court's reasoning for ordering shared physical custody seemed to be based on the court's belief that Father shared in the role as primary caregiver, the court's erroneous determination that shared custody worked during the temporary custody period, and the court's conclusion that the parties should receive equal time to ensure that NJW is bonded to both parents. The court's stated reasons are not a sufficient basis to order shared custody, or are not supported by the evidence.

[¶25] The district court determined that shared custody was appropriate because it had worked out well since entry of the temporary order. There are a number of problems with the court's reasoning. First, the temporary custody period, which took place during the summer months, was not comparable to the parties' lives and schedules the other nine months of the year. Since both parties work as teachers, and were not working at their primary occupations during the summer, the feasibility of a shared custody arrangement in the summer months cannot be extended to the rest of the year. Not only would both parties have the added obligation of teaching, but Father would be coaching, in addition to performing his ranching duties. The district court's finding that shared custody "has worked out well for the interim period[,]" does not predict its workability throughout the remainder of the year, and is not a sufficient basis to award shared custody.

[¶26] Second, the evidence presented at trial does not support the district court's finding that the temporary arrangement worked out well for NJW. While the parties were able to communicate and exchanges were accomplished without incident, testimony from both parties indicated that NJW suffered from separation anxiety due to her long absences from Mother. Mother testified that when NJW was in her care, she would not allow Mother to be out of her sight in the home. Father also testified that NJW did not like

10

being in a room alone, and that NJW was sleeping in Father's bed to alleviate her separation anxiety. The evidence clearly demonstrated that NJW was having difficulty with the shared custody arrangement, and with being removed from her primary caretaker for extended periods of time. Stability in a child's life is of utmost importance, and when the child exhibits anxiety due to the inherent instability of a shared custody arrangement, the court must avoid ordering shared custody on a permanent basis. *See Reavis*, 955 P.2d at 432.

[¶27]  The parties' inability to make joint decisions on matters relevant to NJW's welfare also demonstrated that the shared custody arrangement was not working during the temporary custody period. One of the primary indicators that shared custody will work is the ability of the parents to communicate and cooperate. *Reavis*, 955 P.2d at 433; *Buttle*, 2008 WY 135, ¶¶ 39-40, 196 P.3d at 183. This naturally requires that the parents have shared goals and philosophies on how the child should be raised. *See Reavis*, 955 P.2d at 433 ("The success of a joint or shared custody arrangement hinges on the extent to which the parents are able to communicate and ***agree on matters relevant to the children's welfare***." (emphasis added)). It is clear from the evidence presented that the parties in this case had significantly different philosophies regarding the developmental services NJW should receive. Mother was of the mind that NJW should receive all of the services available to ensure her development. Father, however, believed that NJW should be raised in a manner that made her feel normal, and that some services are not necessary. The parties had significant disagreements over these philosophical differences during the temporary custody period. Moreover, there is ample evidence in the record that the parties fought regularly and often violently during their marriage. The record indicates that the parties continued to struggle throughout the temporary custody period to effectively communicate with each other and make joint decisions relevant to NJW's welfare. While the district court expressed hope that the parties' communication and cooperation would improve, "[b]lind hope that a joint custody agreement will succeed, or that forcing the responsibility of joint decision-making upon the warring parents will bring peace, is not acceptable." *Reavis*, 955 P.2d at 434 (quoting *Taylor v. Taylor*, 508 A.2d 964, 972 (Md. 1986)).

[¶28]  In awarding shared custody, the district court also seemed to rely, in large part, on its reasoning that both parents should be given equal time to ensure that each parent developed a secure bond with NJW. The court stated:

> I have got to look to the best interests of this child and the needs of this child to take every opportunity to bond with each parent. It is so important during the time period of this child's life. And if I can seize out 50 percent of the time and make sure dad has a close, close bond with the child, that is just going to pay dividends for years to come for both of you and for this child.

11

The court went on to state: "And I really think it is important that when we have the opportunity to do so, which is before the child goes to school, that we really, really need to amplify dad's time with this child and really have that bond stick." In a number of cases, we have made clear that a desire to provide equal time to each parent is not sufficient reason to order shared custody. *Testerman*, 2008 WY 112, ¶ 17, 193 P.3d at 1146; *Buttle*, 2008 WY 135, ¶¶ 42-43, 196 P.3d at 184; *Reavis*, 955 P.2d at 434. While ensuring that a child has a close relationship with both parents is a laudable goal, "it falls well short of the 'good reasons' needed to justify the . . . joint custody imposed by the district court." *Testerman*, 2008 WY 112, ¶ 17, 193 P.3d at 1146. "When parties have decided to divorce and lead separate lives, 'the court's objective is not to reconstruct a family that is no more, but to provide the framework for a new family that can best serve the children.'" *Buttle*, 2008 WY 135, ¶ 43, 196 P.3d at 184 (quoting *Resor v. Resor*, 987 P.2d 146, 152 (Wyo. 1999)). Shared custody, in this case, does not provide the framework that best serves NJW. To the contrary, by all accounts, NJW flourished under Mother's primary care when the parties were still married. As we recognized in *Reavis*, "shared physical custody does not necessarily help keep the relationship with both parents strong any more than other custody options." 955 P.2d at 432.

[¶29] Father's busy schedule during the school year also undermines the district court's professed goal of "seiz[ing] out 50 percent of the time [to] make sure dad has a close, close bond with the child[.]" Father admitted that during wrestling season, which begins mid-October and ends in February, he has obligations that take a substantial amount of time. Many weekends during this season are devoted to coaching, and when Father has custody of NJW, this time is spent not with Father, but with grandmother. This is not to say that grandmother is not a good caretaker for NJW, but the reasoning of the court was to devote 50 percent of NJW's time to Father to ensure a close bond. It is clear that much of that 50 percent would be spent with grandmother rather than with Father.

[¶30] In awarding custody, courts must decide what is in the best interests of the child, and one important factor in making that decision is determining what arrangement most closely approximates the former family relationship. *Eickbush v. Eickbush*, 2007 WY 179, ¶ 16, 171 P.3d 509, 514 (Wyo. 2007); *In re KRA*, 2004 WY 18, ¶¶ 18-19, 85 P.3d at 437-38; *Reavis*, 955 P.2d at 432. This provides some sense of stability in the child's life during a period of inevitable upheaval. *See Reavis*, 955 P.2d at 432 (stability is of the "utmost importance to the child's well-being"). This is not a case where a shared custody arrangement approximates how the parties were raising NJW prior to their separation. Prior to the separation, the parties did not divide the hands-on parental responsibilities fifty-fifty. Instead, Mother was primarily responsible for NJW's care on a day-to-day basis. Removing NJW from the care of her primary caregiver for two weeks at a time did not approximate the family structure prior to the parties' separation.

[¶31] We have said that absent good reason, a trial court should avoid ordering a shared physical custody arrangement because of its inherent instability to the child. In this case, the district court failed to consider the effect that the shared custody arrangement was having on NJW, and instead fashioned custody which was "calculated to avoid a parental upper hand." *Reavis*, 955 P.2d at 434. The district court abused its discretion when it ordered shared custody of NJW. We therefore reverse the district court's shared custody order and remand with instructions to award primary physical custody of NJW to Mother, with reasonable visitation to Father, without delay.

[¶32] Because we are reversing the district court's decision regarding custody of NJW and remanding with instructions to award primary physical custody to Mother, the district court is directed to calculate child support consistent with the new custody arrangement.[4]

## II. Did the district court abuse its discretion in its division of the marital assets and liabilities?

[¶33] At the time the parties separated, they owned a large home, land, vehicles and equipment, and a growing cattle operation. At the property distribution trial, the parties presented evidence on the value of the assets and liabilities both in the spring of 2014 (the time the parties separated) and the fall/winter of 2014 (the date the parties were awarded a divorce by the court). At the close of evidence, the court ruled from the bench, valuing the property at the time of separation, and ordering that Father receive the bulk of the property along with the associated debts, and that Mother receive an equalizing payment of $167,509.00. The payment was to be divided into ten equal installments payable each year on December 1. Mother appealed and we affirm.

[¶34] We apply an abuse of discretion standard to our review of division of marital property. *Carlton v. Carlton*, 997 P.2d 1028, 1032 (Wyo. 2000).

> We afford the trial court considerable discretion to form a distributive scheme appropriate to the peculiar circumstances of each individual case, and we will not disturb such a scheme absent a showing that the trial court clearly abused its discretion. The division of property in a divorce case should not be disturbed except on clear grounds as the trial court is usually in a better position than the appellate court to judge the parties' respective merits and needs. *Metz v. Metz*, 2003

---

[4] Mother raises the district court's child support calculation as a separate issue in her brief, and argues that Father's financial affidavit was deficient. Mother failed to raise this issue below, and cannot raise it for the first time on appeal. *Crofts v. State ex rel. Dep't of Game & Fish*, 2016 WY 4, ¶ 35, --- P.3d ---, --- (Wyo. 2016). Furthermore, the issue may be moot because the district court may, in its discretion, require the parties to submit new financial affidavits on remand.

13

WY 3, ¶ 6, 61 P.3d 383, ¶ 6 (Wyo. 2003). The trial court is also in the best position to assess the witnesses' credibility and weigh their testimony. *Raymond v. Raymond*, 956 P.2d 329, 332 (Wyo. 1998). We, therefore, give considerable deference to its findings. *Id.* To the extent findings of fact are in question, we consider only the evidence of the successful party, ignore the evidence of the unsuccessful party, and grant the successful party every favorable inference that can be drawn from the record. *Holland v. Holland*, 2001 WY 113, ¶ 8, 35 P.3d 409, ¶ 8 (Wyo. 2001).

*Hoffman v. Hoffman*, 2004 WY 68, ¶ 9, 91 P.3d 922, 925 (Wyo. 2004).

[¶35] Wyo. Stat. Ann. § 20-2-114 (LexisNexis 2015) governs the division of assets and liabilities upon divorce. It states, in pertinent part:

> [I]n granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children.

[¶36] Mother argues that the court abused its discretion by: (1) awarding Mother only 15 percent of the value of the cattle operation; (2) ignoring the great weight of the evidence concerning the number and value of cattle; (3) setting the valuation date on the date of separation; and (4) allowing Father to make the equalizing payment in installments without accounting for the time value of money. We take each issue in turn.

## A. Award of 15 percent of Cattle Operation to Mother

[¶37] Mother argues that the district court abused its discretion when it awarded her only 15 percent of the value of the cattle operation. Mother contends that the cattle operation was grown entirely over the term of the parties' marriage, and that she contributed to the growth of the operation in the form of physical labor and by taking care of NJW, which allowed Father to work in the field. As a result, Mother argues that she should have been awarded half of the cattle operation or its equal value.

[¶38] Admittedly, the court's award of the cattle operation to Father, while awarding Mother 15 percent of its value, resulted in Father receiving the majority of the parties' assets. However, we have, in similar circumstances, found that such an award is just and equitable. *See generally, Kummerfeld v. Kummerfeld*, 2013 WY 112, 309 P.3d 822

14

(Wyo. 2013); *Wallop v. Wallop*, 2004 WY 46, 88 P.3d 1022 (Wyo. 2004); *France v. France*, 902 P.2d 701 (Wyo. 1995). We cannot say that the district court's decision was an abuse of discretion.

[¶39] First, the district court recognized the relative short duration of the marriage. Mother argues that this should not have been a consideration since the cattle operation was built entirely over the span of the marriage. While the cattle operation grew during the marriage, the evidence demonstrated that Father's family and community contacts contributed significantly to that growth. The parties' ability to begin ranching was due to Father's family's long history of ranching in the region, and Father's participation in his family's ranch throughout his life. Not only was Father able to cultivate contacts through his family, but the parties were able to run their cattle on land owned by Father's family. They also received their first ninety head of cattle at a discounted price through Father's father. They were able to grow the herd as a result of a crop-sharing arrangement entered into with Father's cousin. Moreover, the parties were able to secure various grazing leases due to Father's contacts in the community. It is unlikely that without Father's contacts and family, the cattle operation would have grown to the extent that it did over the course of the parties' marriage.

[¶40] Mother also contends that the district court misapplied the factor allowing the court to consider the position in which the parties will be left following the marriage. She argues that she is in a much worse position than Father because she received very few assets while Father received the bulk of the marital estate. What Mother fails to recognize is that Father also received almost all of the parties' debts incurred over the course of the marriage. The only debt Mother received was her student loan. The remainder of the debt—a mortgage, a line of credit through Sundance State Bank, equipment loans, contract for deed payments—were all assumed by Father. Moreover, we have repeatedly stated that "A just and equitable division of property is just as likely not to be equal." *Kummerfeld*, 2013 WY 112, ¶ 19, 309 P.3d at 827 (citing *Carlton v. Carlton*, 997 P.2d 1028, 1032 (Wyo. 2000)). The district court did not abuse its discretion when it awarded the cattle operation to Father and granted Mother 15 percent of its value.

## B. Number and Value of Cattle

[¶41] Mother argues that the district court abused its discretion when it determined the number and value of cattle owned by the parties because its decision was against the great weight of the evidence. We find that the district court did not abuse its discretion in this regard.

[¶42] Mother takes issue with the court's findings regarding the number of calves that were born on the date of the parties' separation. At trial, Mother testified that a majority of the calving had already occurred by the time she left the marital home, which Mother

estimated amounted to about 140 calves. Father, however, testified that only 10 to 15 percent of the calves were born at the time the parties separated, amounting to between 17.5 and 26.25 calves. Mother contends that Father was being untruthful at trial in an attempt to under-value the parties' marital assets. She points to the testimony of Father's father, Dennis Williams, to support her contention. At trial, the following exchange occurred between Mother's counsel and Mr. Williams:

> Q. How many calves do you typically get in the first heat period?
>
> . . . .
>
> A. Oh, normally about 60 percent.[5]

[¶43] Mother argues that Mr. Williams' testimony confirms that Father was lying when he testified about the calves. A closer inspection of that testimony, however, reveals that is not the case. Mr. Williams testified that, *on average*, 60 percent of calves were born from the "first heat period." Mr. Williams' testimony does not define when the "first heat period" occurred. He stated that, depending on the year, it is possible for this percentage to be higher or lower. Father's testimony correlates with that of Mr. Williams. Father explained that the calves arrived late in 2014, and despite his expectations, there were no calves born in March. According to Father, the first calves did not arrive until April that season, which may have accounted for the unusually low number at the time of the parties' separation.

[¶44] The district court reasoned, "But in any event, the fact of the matter is that my view is [Father] was there. He was on the scene. And I have no reason to believe he is misrepresenting this to the court. The court is going to go with his number." The trial court is in the best position to assess and weigh the credibility of witnesses. *Raymond*, 956 P.2d at 332. Because we defer to the district court's credibility determination, we cannot find, as Mother argues, that Father was being untruthful when he testified concerning the number of calves born at the time of the parties' separation. The district court could reasonably conclude that Father's estimate of the number of calves was accurate and credible. We therefore find that the district court did not abuse its discretion when it adopted Father's testimony.

## C. Valuation Date

[¶45] Mother takes issue with the district court's decision to value the parties' marital estate on the date of separation in mid-April 2014, rather than at the time the court granted a divorce. Mother argues that this was inequitable because she was precluded

---

[5] Sixty percent of the calves would be 105 calves.

from sharing in the increased value of the cattle which occurred in the interim, but was required to service the debts that helped generate the increase in value.

[¶46]  "This court has not identified with particularity the time at which marital property must be valued when dividing property in a divorce.  Rather, this court has taken the general approach that the appropriate time of valuation is a matter within the broad and sound discretion of the trial court."  *Wallop*, 2004 WY 46, ¶ 11, 88 P.3d at 1025.  In this case, the evidence presented supported the district court's decision to value the estate at the time of the parties' separation.  After Mother left the marital home, the parties lived, for all intents and purposes, separate and distinct lives, insofar as their finances were concerned.  As such, we hold that the district court did not abuse its discretion when it selected the date of separation rather than the date of divorce for valuing the parties' property.

[¶47]  Mother argues that the inequity arises due to the fact that the district court valued the cattle at the date of separation, but failed to value the parties' debts on the same date.  She contends that she shared in the expenses the parties amassed from the date of separation through the date of divorce, but the court precluded her from sharing in the increased value those expenses generated.  The only example provided by Mother that is supported by the record is the prepayment of a grazing lease in November 2013.  At trial, Father established that the lease was prepaid in the amount of $6,000, and that the cattle were serviced on that lease after the separation.  The district court did not separately consider this prepaid lease in its division of the marital estate.  However, even if we were to determine that the district court abused its discretion in failing to separately consider this payment, in comparison to the marital estate and to the total amount awarded to Mother, the amount in question is so small as to be *de minimis. See Odegard v. Odegard*, 2003 WY 67, ¶ 26, 69 P.3d 917, 925 (Wyo. 2003) ($4,000 difference in a 1.5 to 2 million dollar estate was *de minimis*); *see also In re Marriage of Peterson*, 918 P.2d 858, 860 (Or. Ct. App. 1996) ($20,450 error does not require adjustment where division ended up being $169,827 for husband and $182,444 for wife).  We therefore find that the district court's omission of the prepaid lease from its division to be harmless and not an abuse of discretion.  W.R.A.P. 9.04.

## D.  Interest on Equalizing Payment

[¶48]  Mother argues that the district court erred when it failed to account for the time value of money in awarding her an equalizing payment of $167,509.  In its order, the district court ruled, "As long as this amount is paid off over the course of ten years in equal installments, post judgment interest will not apply."  Mother argues that this was an abuse of discretion and contrary to law.

[¶49]  Wyo. Stat. Ann. § 1-16-102(a) (LexisNexis 2015) provides: "[A]ll decrees and judgments for the payment of money shall bear interest at ten percent (10%) per year

from the date of rendition until paid." Mother contends that the term "shall" requires the court to order interest on any judgment to be paid over time. We have recently addressed this exact issue in *Sinclair v. Sinclair*, 2015 WY 120, 357 P.3d 1100 (Wyo. 2015), a divorce case in which the court ordered husband to pay wife an equalizing sum in ten yearly installments, but suspended interest as long as husband complied with the minimum yearly payments. *Id.* at ¶ 6, 357 P.3d at 1101-02. We upheld the district court's decision, and found that when a court expressly orders payment on a date different than that of the decree or judgment, the strictures of Wyo. Stat. Ann. § 1-16-102 are overridden. *Id.* at ¶ 17, 357 P.3d at 1105. We therefore determined that, in *Sinclair*, "the district court properly exercised its discretion to fashion a distributive scheme appropriate to these parties and their circumstances." *Id.* at ¶ 16, 357 P.3d at 1104. The same is true here. The district court ordered Father to pay Mother on a date different than the judgment, and as a result, Wyo. Stat. Ann. § 1-16-102 did not apply. There was no abuse of discretion when the district court did not require Father to pay interest on the equalizing sum awarded to Mother.

## *CONCLUSION*

[¶50] The district court abused its discretion when it ordered shared physical custody of NJW. We therefore reverse the district court's shared custody order and remand with instructions to award primary physical custody of NJW to Mother, with reasonable visitation to Father, without delay. The district court is also instructed to calculate child support consistent with the new custody arrangement.

[¶51] The district court did not abuse its discretion in its division of the marital property, which was just and equitable. We therefore affirm that portion of the district court's divorce decree.